**Ruth KRASNER, Plaintiff,**

v.

**The DREYFUS CORPORATION and Dreyfus Liquid Assets, Inc., Defendants.**

**Meyer GROSS and Karen Gross, etc., Plaintiffs,**

v.

**The DREYFUS CORPORATION and Dreyfus Liquid Assets, Inc., Defendants.**

**Nos. 76 Civ. 1478 (JMC), 76 Civ. 4010 (JMC).**

United States District Court, S. D. New York.

Aug. 27, 1980.

Pomerantz, Levy, Haudek & Block by Abraham L. Pomerantz, New York City, for plaintiff Krasner.

Lowey, Dannenberg & Knapp, P. C. by Richard B. Dannenberg, New York City, for plaintiffs Gross.

Silverman & Haines by Joan T. Harnes, New York City, for plaintiff Untermeyer.

Stroock & Stroock & Lavan by Laurence Greenwald, New York City, for defendant Dreyfus Liquid Assets, Inc.

Rogers & Wells by William F. Koegel and William H. Mulligan, Jr., New York City, for defendants Dreyfus Corp., Jerome S. Hardy, Joseph S. Di Martino, and William Berkowitz.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Joint application for approval of a proposed consolidated settlement of all four of these shareholder derivative cases is denied, without prejudice to renewal upon supplementation of the record as provided herein. Fed.R.Civ.P. 23.1.

Petitions for attorneys' fees shall await the Court's decision on the proposed settlement.

## BACKGROUND

Presently before the Court is a stipulation of settlement of four consolidated shareholder derivative actions brought on behalf of Dreyfus Liquid Assets, Inc. ["the Fund"], as well as related petitions for attorneys' fees. Since the procedural history of these cases is rather unusual, a brief description of it is in order.

The first action was brought by Walter Untermeyer, Jr., on January 14, 1976, alleging that the Fund violated section 22 of the Investment Company Act of 1940, 15 U.S.C. § 80a–22, by valuing its portfolio at below fair market value. This action was initially assigned to Judge Goettel. The second and third actions, filed later that year by Ruth Krasner and Meyer and Karen Gross, respectively, allege that the compensation paid by the Fund to its investment adviser, The Dreyfus Corporation ["the Corporation"], was and is excessive, and therefore, in violation of section 36(b) of the Act, 15 U.S.C. § 80a–35(b). These actions were assigned to this Court.

On July 28, 1977, the parties in the *Krasner* and *Gross* cases entered into a stipulation of settlement, which they thereupon submitted to the Court for approval pursu-

ant to Fed.R.Civ.P. 23.1. The Court conducted a hearing on September 19, 1977, on the proposed settlement, at which time Walter Untermeyer, Jr., objected, primarily on the ground that the proposed settlement permitted the defendants to continue charging allegedly excessive management fees. In a Memorandum Decision and Order dated June 30, 1978, the Court approved the settlement over the objections of Untermeyer and other shareholders,[1] and also approved a fee request of $270,000 by counsel for Krasner and Gross.

Untermeyer then appealed this Court's approval of the settlement and award of attorneys' fees. While this appeal was pending, Untermeyer moved to amend his complaint, which was pending before Judge Goettel, to add claims of excessive management fees. Judge Goettel denied this motion, and Untermeyer thereafter filed a new complaint alleging such claims on November 21, 1978, which was assigned to Judge Griesa.

The Court of Appeals for the Second Circuit heard oral argument on Untermeyer's appeal from the approval of the settlement in the *Krasner* and *Gross* cases on March 29, 1979. Then, on May 11, 1979, while the appeal was *sub judice*, Untermeyer's attorney informed the Court of Appeals by letter that:

> Subsequent to the argument, on behalf of my client an agreement was reached with the attorneys for the investment advisor and the Fund. The new agreement, in my opinion, meets the . . . ·objections and renders the controversy before this Court moot. The new agreement will, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, be placed before the district court for approval, and notice of the new agreement will promptly be given to all shareholders. In view of the agreement reached,

all parties to the appeal consent to have the appeal withdrawn without costs.[2]

The letter enclosed an executed stipulation for withdrawal of the appeal, without costs.

On May 17, 1979, the Second Circuit granted the joint application to withdraw the appeal, stating in part:

> On May 11, 1979, the court received a letter from counsel for the objecting stockholder stating that his objections had been removed, by a new agreement, whose terms were not disclosed, which would be placed before the district court for approval on notice to all shareholders . . . .
>
> Before receiving this communication the court had concluded that the reasons given by the district court for approving the settlement were inadequate and that more detailed findings were demanded. In cases like these the interests of all stockholders and not simply those of the appealing stockholder must be taken into account. In dismissing the appeal without costs, as we do by this order, we wish to make clear that the district court should not deem its previous action a sufficient basis for approving the new settlement. We take no position on the merits, save in one respect. If the revised settlement involves payment over a term of years, we would be much concerned with any provision similar to that in the settlement here before us requiring the Fund to use its best efforts to require any new entity that might be chosen as manager to assume the obligations of The Dreyfus Corporation for unpaid instalments. *Prima facie* such a provision appears inconsistent with the purpose of the final paragraph of § 15(c) of the Investment Company Act.

*Gross v. The Dreyfus Corporation,* 607 F.2d 995 (2d Cir. 1979).

At the suggestion of the parties, this Court then accepted transfer of the two

---

1. The executors of the Estate of Joseph Rosenbach also objected on grounds essentially similar to those urged by Untermeyer. *See* Objections to Proposed Settlement (filed Sept. 7, 1977).

2. *See* Memorandum and Order at 3, Nos. 76 Civ. 1478 (JMC), 76 Civ. 4010 (JMC) (S.D.N.Y. dated June 27, 1979; filed June 28, 1979).

*Untermeyer* cases from Judges Goettel and Griesa. As to the *Krasner* and *Gross* cases, counsel for all parties voiced the opinion that, since the Second Circuit had neither remanded nor retained jurisdiction over them, this Court's judgment approving the settlement had in all respects become final. This Court disagreed, construing the Second Circuit's action instead as a dismissal on condition that "the suits then pending before the Court of Appeals be resettled before the district court." Memorandum and Order at 7 (dated June 27, 1979; filed June 28, 1979) (citing Fed.R.App.P. 42(b)).

The Court then took "the extraordinary step" of bringing on its own motion to vacate the judgment. *Id.* at 6. After hearing the parties on July 5, 1979, the Court vacated its judgment in the *Krasner* and *Gross* cases, and afforded counsel an opportunity to submit a consolidated proposed settlement of all four actions, providing for new notice to shareholders. *See* Memorandum and Order (dated July 12, 1979).

The parties eventually did arrive at a comprehensive settlement, which they then submitted to the Court along with requests for awards of attorneys' fees. Upon notice to all shareholders, the Court conducted a hearing on the proposed settlement and attorneys' fees petitions on June 12, 1980. No shareholder objected to the proposed settlement, although two shareholders objected to the attorneys' fees petitions, contending that any award of fees should be paid by the Corporation and not the Fund.

## TERMS OF SETTLEMENT

*The Original Krasner/Gross Settlement*

The original settlement of the *Krasner* and *Gross* cases, as contained in the stipulation of July 28, 1977, provided for the discontinuance of the actions in return for annual payments by the Corporation to the Fund for each of the years 1977 through 1986, in amounts ranging between $150,000 and $250,000, with the payment for 1977

fixed at $200,000, and the precise amount for each subsequent year depending upon the average daily net asset value of the Fund that year. Although it was at the time difficult to predict what these payments would be, the recent rapid growth in the Fund's assets makes it likely that the maximum $250,000 will be payable for 1979 and each year thereafter.[3]

The original settlement further provided that instead of making outright cash payments to the Fund, the Corporation would assume certain recurring expenses theretofore paid by the Fund, including expenses for printing prospectuses, for investor services, and for certain other services. If the amount payable under the stipulation exceeded such expenses for a particular year, the Corporation would pay the excess to the Fund in cash.

Additionally, the stipulation contained the following provision:

> In the event that prior to December 31, 1986, neither the Corporation nor any Successor shall continue as the Fund's manager, the Fund agrees to use its best efforts to require any person assuming the management function to abide by the terms of the Stipulation of Settlement, and if the obligations of the Corporation thereunder are assumed by such person, the Corporation's obligation thereunder shall cease.

As already noted, the Court of Appeals has expressed its opinion that this provision appears inconsistent with section 15(c) of the Investment Company Act, 15 U.S.C. § 80a–15(c).

*The Amended Krasner/Gross Settlement*

The amended stipulation of settlement retains the original settlement's payment formula for annual payments between 1977 and 1986, except that the payments will be made in cash or by a reduction of the management fee, rather than by assumption of

---

**3.** *See* Affidavit of Abraham L. Pomerantz in Support of Settlement and Fee Application at

5 6 (filed May 19, 1980).

expenses as previously provided. Additionally, the amended settlement requires the Corporation to make additional annual payments of up to $60,000 as follows: the Corporation will pay an additional $200 per year for each $1 million in average daily net asset value in excess of $1.2 billion, but not beyond $1.5 billion. Since the average daily net asset value of the Fund has been above $1.5 billion since August 10, 1979, and is now over $3 billion, it can reasonably be estimated that the maximum $60,000 under this formula will be payable in 1979 and each subsequent year.[4]

Over and above such payments, the amended settlement contains additional benefits for the shareholders. *First*, the Corporation will bear all expenses of printing and distributing prospectuses. *Second*, the Corporation has agreed to alter the rate of its annual management fee, which has until now been a flat 0.5% of average daily net assets. Under the revised formula, the fee would be determined by the following sliding scale:

| Average Daily Net Assets | Rate of Fee |
| --- | --- |
| First $1.5 billion | 0.50% |
| Between $1.5 and $2 billion | 0.48% |
| Between $2 and $2.5 billion | 0.47% |
| Over $2.5 billion | 0.45% [5] |

If approved, this fee reduction will apply for the year 1979 and all years thereafter, not merely through 1986.

Finally, the parties have eliminated the provision found objectionable by the Court of Appeals. The amended settlement provides:

Notwithstanding any provision of the original Krasner/Gross Stipulation, and superseding any obligation to the contrary included in said Stipulation, neither the Fund nor its directors shall have any obligation to attempt to have a successor manager assume the obligations of the Corporation under the Stipulation [original] and the [revised stipulation].

*The Untermeyer Settlements*

The parties have agreed to discontinue Untermeyer's first action provided that the Fund includes the following disclosure provision in its prospectus to prospective shareholders:

There are various methods of valuing the assets and of paying dividends and distributions from a money market fund. In general, the Company values its assets at available bid prices or yield equivalents for the securities being valued or for comparable securities. The Company rounds its net asset value per share to the nearest $.01 on a $1.00 price and expects that the Company's price per share for purposes of sales and redemptions will remain at $1.00. The Company pays dividends only from net investment income. The Securities and Exchange Commission has issued an Order of Exemption from the applicable provisions of the Investment Company Act of 1940, permitting the Company to engage in this method of valuation and pricing. Certain other money market funds value their assets at cost and pay dividends consisting only of net investment income. Other money market funds value their asserts at market and pay dividends consisting of net investment income plus or minus realized and unrealized appreciation or depreciation of principal. Accordingly, the re-

---

4. *See* Memorandum of Defendants The Dreyfus Corporation, Jerome S. Hardy, Joseph S. Di Martino, and William Berkowitz in Support of the Proposed Settlement at 8.

5. As the Court understands it, this scale would operate in the following fashion. If, for example, the average daily net assets for a particular year were $3 billion, the total advisory fee payable for that year would be:

0.5% of the first $1.5 billion, or $7.5 million, plus 0.48% of the next $0.5 billion, or $2.4 million, plus 0.47% of the next $0.5 billion, or $2.35 million, plus 0.45% of the remaining $0.5 billion, or $2.25 million, for a total of $14.5 million.

The amended settlement provides that this fee scale will be submitted to the shareholders of the Fund. *See* Amendment of Stipulation of Settlement ⁶ 6 (filed March 20, 1980).

ported yields of the Company may not be comparable with the reported yield of certain other mutual funds having investment objectives similar to the Company's.

As to Untermeyer's second action, the parties propose that it be discontinued on the basis of the amended settlement in the *Krasner* and *Gross* cases.

### Attorneys' Fees Petitions

In its Memorandum Decision and Order dated June 30, 1978, the Court approved a request by counsel for plaintiffs for fees of $266,898.11, plus expenses of $3,101.89. Since the value of counsel's time at non-contingent billing rates was found to be $126,798.50, the Court's award included a "risk multiplier" of approximately 2.17 to compensate for the risks of litigation assumed by counsel. Counsel for Krasner and Gross now seek an additional $80,000, of which $2,467.91 represents additional expenses, and $77,532.09, additional fees, for their efforts in (1) opposing the Untermeyer appeal, and (2) negotiating the consolidated settlement of all four instant actions.

Counsel for Untermeyer has submitted an application for an award of $100,000 in fees and expenses. As part of the overall settlement of these actions, the defendant Corporation has agreed to pay Untermeyer's counsel's fees.

### DISCUSSION

*The Krasner/Gross Settlement*

Given the Court of Appeals' admonition in its Memorandum Order dismissing the intervenor's appeal, this Court may not rely on its earlier approval of the original settlement in the *Krasner* and *Gross* cases as a basis for approving the amended settlement. Accordingly, the Court approaches the amended settlement de novo.

In *Desimone v. Industrial Bio–Test Laboratories, Inc.*, 83 F.R.D. 615 (S.D.N.Y.1979), Chief Judge MacMahon of this district succinctly set forth the steps necessary to a

court's evaluation of a proposed settlement of a class or derivative action:

First, the proponents have the burden of proving that (1) the settlement is not collusive but was reached after arm's length negotiation; (2) the proponents are counsel experienced in similar cases; (3) there has been sufficient discovery to enable counsel to act intelligently and (4) the number of objectants or their relative interest is small. If the proponents establish these propositions, the burden of attacking the settlement then shifts to the objectants, if any. Finally, the court must approve the settlement only after finding it to be reasonable in light of the plaintiffs' ultimate probability of success in the lawsuit.

. . . . .

In determining reasonableness, the courts in this circuit have not applied any single, inflexible test. Instead, they have considered the amount of the settlement in light of all the circumstances, including such factors as: (1) the best possible recovery; (2) the likely recovery if the claims were fully litigated; (3) the complexity, expense and probable duration of continued litigation; (4) the risk of establishing liability; (5) the risk of establishing damages; (6) the risk of maintaining the class action throughout trial; (7) the reaction of the class to the settlement; (8) the stage of the proceedings and (9) the ability of the defendants to withstand a greater judgment.

*Id.* at 618–19 (footnotes omitted).

Here, the amended settlement of the *Krasner* and *Gross* actions, upon which the dismissal of the second *Untermeyer* complaint also depends, is the product of arm's length negotiations,[6] between capable and experienced attorneys. Moreover, although notice of the proposed revised settlement has been sent to approximately 200,000 shareholder accounts, not one person has objected to the substantive terms of the

---

**6.** *See* Affidavit of Joan T. Harnes at 4 -5 (filed May 2, 1980).

settlement.[7] Whether sufficient discovery has been taken to enable counsel to act intelligently, however, is not clear, as the discussion of the factors pertaining to reasonableness, below, suggests.

On the question of risk of liability, what the Court expressed in its June 30, 1978 Memorandum Decision and Order remains true: "there has never been a recovery, on the merits, in a suit claiming excessive advisory fees." Memorandum Decision and Order, *supra*, at 4. Consequently, it is very difficult to predict whether, after litigation, a flat rate of 0.5% of average daily net asset value regardless of the Fund's size, would be found unfair, and thus a violation of the statute. This is not to say, however, that any fees charged by an investment advisor are acceptable. Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a–35(b), imposes upon investment advisors of registered investment companies "a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment advisor." 15 U.S.C. § 80a–35(b). The Court of Appeals for the Second Circuit has interpreted this provision as limiting the fees that may legally be charged by an advisor to what can be considered "fair" under traditional equitable standards. *Galfand v. Chestnutt Corporation*, 545 F.2d 807, 811–12 & n.12 (2d Cir. 1976), *cert. denied*, 435 U.S. 943, 98 S.Ct. 1524, 55 L.Ed.2d 540 (1978). "[E]ven where a fiduciary has made full disclosure, it is the duty of a federal court to subject the transaction to rigorous scrutiny for fairness." *Id.* at 812 (citing *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)).

One source suggests that an evaluation of fairness requires not merely a comparison of a particular adviser's fees to industry norms, but rather a more detailed analysis of at least seven factors:

(1) "[t]he nature, quality and extent of the service to be rendered"; (2) "the extent to which economies of scale and common management [in the case of a fund complex] were shared with the fund"; (3) whether "comparable charges [were] made by the adviser" to other investors and whether those charges are prevalent within the fund industry; (4) "the value of all other benefits received" by the fund; (5) whether the directors approved and the shareholders ratified the advisory fee agreement; (6) whether there was complete and effective disclosure of all pertinent information by the adviser; and, (7) whether the deliberations of the directors were a matter of substance or a mere formality.

Note, *Mutual Fund Advisory Fees—Too Much for Too Little?*, 48 Fordham L.Rev. 530, 545–46 (1980).

As to the various questions relating to damages, it is likewise at this point exceedingly difficult to estimate "the risk of establishing damages," "the best possible recovery," or "the likely recovery if the claims were fully litigated." Under section 36(b), the plaintiffs are limited to recovery of "actual damages resulting from the breach of fiduciary duty," which means they would have to prove the amount by which the 0.5% fee exceeded a fair fee.

The proponents of the amended settlement have offered little evidence from which to determine "fairness." Accordingly, the Court has undertaken some limited research on its own to learn the fee arrangements of comparable funds. What the Court has discovered, which it suggested to the proponents at the hearing on the instant application, is that some funds base their fees upon sliding scales that are substantially steeper than the one contained in the amended settlement. The following is

---

**7.** *See* Memorandum of Defendants, etc., *supra* note 4, at 17. In all, only two shareholders have filed objections, and these objected to the Fund's having to pay the fees of the plaintiffs' attorneys in the *Krasner* and *Gross* cases.

the fee scale of the Merrill Lynch Ready Assets Trust: [8]

| Average Daily Net Assets | Rate of Fee |
|---|---|
| First $0.5 billion | 0.500% |
| Between $0.5 and $0.75 billion | 0.425% |
| Between $0.75 and $1 billion | 0.375% |
| Between $1 and $1.5 billion | 0.350% |
| Between $1.5 and $2 billion | 0.325% |
| Between $2 and $2.5 billion | 0.300% |
| Over $2.5 billion | 0.275% |

The following is the fee scale of the Inter-Capital Liquid Asset Fund Inc.: [9]

| Average Daily Net Assets | Rate of Fee |
|---|---|
| First $0.5 billion | 0.500% |
| Between $0.5 and $0.75 billion | 0.425% |
| Between $0.75 and $1 billion | 0.375% |
| Between $1 and $1.5 billion | 0.350% |
| Between $1.5 and $2 billion | 0.325% |
| Between $2 and $2.5 billion | 0.300% |
| Between $2.5 and $3 billion | 0.275% |
| Over $3 billion | 0.250% |

For average daily net assets of $3 billion or less, therefore, the InterCapital rate is the same as Merrill Lynch's.

■ In order to compare the actual monetary difference between these fee formulas and the one contained in the amended settlement, the Court must ascertain or estimate the net asset value of the Fund during the years for which recovery may be had under the instant complaints. Section 36(b) of the Investment Company Act provides that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted." The *Krasner* complaint was filed on March 29, 1976; consequently, the starting date for the computation of any recovery is March 29, 1975.

According to the Fund's 1975 annual report, the management fee paid to the Corporation in 1975 was approximately $4.5 million; thus the Fund's average daily net asset value for 1975 was approximately $0.9 billion.[10] The parties agree that on December 31, 1976, the Fund's total net assets were "slightly in excess of" $0.8 billion; thus, in the absence of a better estimate, the Court will use this figure as the average daily net asset value for that year.

The parties have further informed the Court that "the Fund's average daily net asset value has been over [$1.5 billion] since August 10, 1979, and has been approximately [$3.0 billion] for the past several months." Using a very rough interpolation, the Court therefore estimates the Fund's average daily net asset value as $0.9 billion for 1977, $1.2 billion for 1978, and $1.5 billion for 1979. Additionally, while the Fund's net asset value is likely to grow in the future, the Court will simply assume for the purposes of this analysis that it will remain constant at $3.0 billion for 1980 and thereafter.[11]

On the basis of these estimates, the following table shows the advisory fee payable for the last nine months of 1975, and each year thereafter, under three different formulas: (1) a flat 0.5% rate as charged by the Corporation prior to the settlement of these actions; (2) the rate provided in the amended settlement, taking into account both the sliding scale fee reduction schedule, and the cash payments for 1977 through 1986; and (3) the Merrill Lynch and InterCapital rates, which are the same here, since the average daily net asset value is presumed never to exceed $3 billion.

---

8. Prospectus of Merrill Lynch Ready Assets Trust at 12 (April 30, 1980); Prospectus of Merrill Lynch Ready Assets Trust II at 13 (June 10, 1980).

9. Prospectus of InterCapital Liquid Asset Fund Inc. at 14–15 (Jan. 1, 1980). This fund is managed by a wholly-owned subsidiary of Dean Witter Reynolds Organization Inc.

10. *See* Affidavit of Sydney B. Silverman, Esq., In Opposition to Proposed Settlement, Exhibit D, at 6 (filed Oct. 4, 1977) (copy of Dreyfus Liquid Assets, Inc., Annual Report, Dec. 31, 1975).

11. Such an assumption is expressly invited by counsel for Krasner. *See* Affidavit of Abraham L. Pomerantz, Esq., In Support of Settlement and Fee Application at 6 n.* (filed May 19, 1980).

| YEAR | AV. DAILY NET ASSETS ($ Billion) | ADVISORY FEE ($ Million) | | |
| --- | --- | --- | --- | --- |
| | | (1) 0.5% Rate | (2) Settlement Rate | (3) Merrill/Inter-Capital Rate |
| 1975 (¾ year) | 0.9 | 3.38 | 3.38 | · 3.09 |
| 1976 | 0.8 | 4.00 | 4.00 | 3.75 |
| 1977 | 0.9 | 4.50 | 4.30 | 4.13 |
| 1978 | 1.2 | 6.00 | 5.75 | 5.20 |
| 1979 | 1.5 | 7.50 | 7.19 | 6.25 |
| 1980 through ) 1986 ) | 3.0 | 15.00 | 14.19 | 10.75 |
| ·1987 and ) after ) | 3.0 | 15.00 | 14.50 | 10.75 |

It should be remembered that the amended settlement also provides that the Corporation will assume the cost of printing prospectuses, which had, at the time of the complaint, been borne by the Fund. This added benefit is not reflected in the table above, however, since the Court does not know whether the Merrill Lynch and Inter-Capital funds had comparable arrangements.

Also, the Court recognizes the limitations of this table, and takes no position at this time as to whether the Merrill Lynch and InterCapital formulas represent either the best or a likely result. Since there are apparently numerous funds which pay a flat advisory fee of 0.5% of average daily net asset value,[12] there is at least some chance that after a full trial on the merits, such a rate would be found to be fair in this case. Nonetheless, the table does suggest that further inquiry may be in order.

 In deciding whether to approve the amended settlement, the Court is well aware that its function is "not to substitute [its] business judgment for that of the negotiators who bargained at arm's length, but only to insure that the arrangement is not so unfair as to require disapproval." *Desimone, supra,* 83 F.R.D. at 619. More-over, the Court agrees with the proponents that it should accord substantial weight to the shareholders' approval of the management contract, and the absence of shareholder objections to the amended settlement. Nevertheless, in light of the substantially more favorable fee structures indicated in the comparative table above, and notwithstanding the sizeable risks of continue litigation, the Court finds the question of reasonableness to be a very close one, which has been made considerably more so by the proponents' failure to offer "estimates of the best possible recovery and of the probability of recovery upon continuation of the litigation." *Id.* at 620.

What most concerns the Court are not the fees that would be payable under the amended settlement for the years 1975 through 1979, but rather, the fees payable thereafter. The relatively gentle slope of the amended settlement's sliding fee scale suggests to the Court that the Corporation is unwilling to share with the Fund—in more than a trifling way—the substantial economies of scale that must necessarily have resulted from the Fund's recent explosive growth. When this Court approved the original settlement in these cases, the annual advisory fee payable to the Corporation was under $5 million. The annual advisory

**12.** *See* Note, *Mutual Fund Advisory Fees Too Much for Too Little?*, 48 Fordham L.Rev. 530, 534 (1980).

fee for 1980 and thereafter, even under the terms of the amended settlement, will probably be nearly three times that, yet the Court has seen no evidence that the efforts and expenses of the Corporation on behalf of the Fund will be any greater than they were two years ago, or, in any event, sufficiently greater to justify such an enormously increased fee. The attitude of the Corporation appears to be that the lion's share of any savings resulting from the increased size of the Fund shall redound to the Corporation. This hardly seems consistent with the Corporation's "fiduciary duty with respect to [its] receipt of compensation for services."

### CONCLUSION

Accordingly, the Court declines to approve the proposed amended settlement without further evidence of the best possible recovery and the probable recovery in these cases. Such evidence should include a comparison of fees paid by all competitive funds of reasonably comparable size, as well as evidence with respect to the seven factors mentioned above as pertinent to a determination of the fairness of an advisory fee. Moreover, to the extent that the Court's estimates of the Fund's average daily net asset value for the relevant years are inaccurate, the proponents should provide more precise figures.

The Court's decision on the proposed settlement of Untermeyer's first complaint, and the petitions for attorneys' fees shall await the proponents' supplementation of the record as suggested herein. The proponents shall advise the Court, as soon as possible, of the amount of time they will need to comply.

SO ORDERED.