Ruth KRASNER, Plaintiff,

v.

The DREYFUS CORPORATION and
Dreyfus Liquid Assets, Inc.,
Defendants.

Meyer GROSS and Karen Gross,
etc., Plaintiffs,

v.

The DREYFUS CORPORATION and
Dreyfus Liquid Assets, Inc.,
Defendants.

Walter UNTERMEYER, Jr., Plaintiff,

v.

DREYFUS LIQUID ASSETS, INC., et
al., Defendants.

Walter UNTERMEYER, Jr., Plaintiff,

v.

DREYFUS LIQUID ASSETS, INC., et
al., Defendants.

Nos. 76 Civ. 1478 (JMC), 76 Civ. 4010
(JMC), 76 Civ. 184 (JMC) and 78
Civ. 5636 (JMC).

United States District Court,
S. D. New York.

July 13, 1981.

**666**

Pomerantz, Levy, Haudek & Block, New York City (Abraham L. Pomerantz, New York City, of counsel), for plaintiff Krasner.

Lowey, Dannenberg & Knapp, P. C., New York City (Richard B. Dannenberg, New York City, of counsel), for plaintiffs Gross.

Silverman & Harnes, New York City (Joan T. Harnes, New York City, of counsel), for plaintiff Untermeyer.

Rogers & Wells, New York City (William P. Rogers, William F. Koegel and William H. Mulligan, Jr., New York City, of counsel), for defendants Dreyfus Corp., Jerome S. Hardy, Joseph S. DiMartino and William Berkowitz.

Stroock & Stroock & Lavan, New York City (Laurence Greenwald and Bruce H. Schneider, New York City, of counsel), for defendants Dreyfus Liquid Assets, Inc., Daniel H. Brill, Virginia A. Dwyer, Martin D. Fife, Whitney I. Gerard and Jonas E. Salk.

## MEMORANDUM AND ORDER

CANNELLA, District Judge.

Joint application for approval of a proposed consolidated settlement of these four shareholder derivative actions is approved. Fed.R.Civ.P. 23.1.

Plaintiffs' application for attorneys' fees, costs and disbursements in *Krasner v. Dreyfus Corp.*, 76 Civ. 1478 (JMC) ["*Krasner*"], and *Gross v. Dreyfus Corp.*, 76 Civ. 4010 (JMC) ["*Gross*"], is granted in the amount of $350,000, to be paid by Dreyfus Liquid Assets, Inc. Plaintiff's application for at-

torneys' fees, costs and disbursements in *Untermeyer v. Dreyfus Liquid Assets, Inc.*, 76 Civ. 184 (JMC) ["*Untermeyer I*"], and *Untermeyer v. Dreyfus Liquid Assets, Inc.*, 78 Civ. 5636 (JMC) ["*Untermeyer II*"], is granted in the amount of $100,000, to be paid by The Dreyfus Corporation.

## FACTS

The extraordinary history of this litigation is reviewed at length in the Court's Memorandum and Order of August 27, 1980, *see Krasner v. Dreyfus Corp.*, 500 F.Supp. 36 (S.D.N.Y.1980) [the "August 27th decision"], and that portion of the decision is hereby incorporated by reference herein.[1] The terms of the original and amended stipulations of settlement in the *Krasner* and *Gross* cases, as well as the stipulation of settlements in both *Untermeyer* actions, are also fully set forth in the Court's August 27th decision. There has been no change since then in the settlement terms and they need not be repeated herein, except as necessary for purposes of illustration.

When the Court denied without prejudice the joint application for approval of settlement, it explained to the parties what it considered to be the shortcomings of that application, and directed them to supplement the record with evidence concerning (1) the best possible recovery and the probable recovery in these cases, (2) the fees paid by all competitive money market funds of reasonably comparable size, and (3) the seven factors mentioned as pertinent to a determination of the fairness of an advisory fee. While the Court recognizes that this request caused certain hardships for the litigants, it appreciates their efforts to comply therewith, especially in light of plaintiffs' counsel's decision not to seek additional attorneys' fees for this undertaking.

## DISCUSSION

In evaluating a proposed settlement in a derivative action, the Court's function

---

1. The Court's other prior written decisions in this case are as follows: Memorandum Decision and Order (filed June 30, 1978), *dismissed sub nom. Gross v. Dreyfus Corp.*, 607 F.2d 995 (2d Cir. 1979); Memorandum and Order (filed June 28, 1979); Order (filed July 5, 1979); Memorandum and Order (filed July 12, 1979).

is "not to substitute [its] business judgment for that of the negotiators who bargained at arm's length, but only to insure that the arrangement is not so unfair as to require disapproval." *Desimone v. Industrial Bio-Test Laboratories, Inc.*, 83 F.R.D. 615, 619 (S.D.N.Y.1979) (footnote omitted). Chief Judge MacMahon's succinct articulation of the steps entailed in such an evaluation was adopted by the Court in the August 27th decision, and bears repeating herein:

> First, the proponents have the burden of proving that (1) the settlement is not collusive but was reached after arm's length negotiation; (2) the proponents are counsel experienced in similar cases; (3) there has been sufficient discovery to enable counsel to act intelligently and (4) the number of objectants or their relative interest is small. If the proponents establish these propositions, the burden of attacking the settlement then shifts to the objectants, if any. Finally, the Court must approve the settlement only after finding it to be reasonable in light of the plaintiffs' ultimate probability of success in the lawsuit.
>
> . . . .
>
> In determining reasonableness, the courts in this circuit have not applied any single, inflexible test. Instead, they have considered the amount of the settlement in light of all the circumstances, including such factors as: (1) the best possible recovery; (2) the likely recovery if the claims were fully litigated; (3) the complexity, expense and probable duration of continued litigation; (4) the risk of establishing liability; (5) the risk of establishing damages; (6) the risk of maintaining the class action throughout the trial; (7) the reaction of the class to the settlement; (8) the stage of the proceedings and (9) the ability of the defendants to withstand a greater judgment.

*Id.* at 618–19 (footnotes omitted).[2]

The Court adheres to its prior finding that the proposed amended settlement in the *Krasner, Gross* and *Untermeyer II* ac-

tions "is the product of arm's length negotiations, between capable and experienced attorneys." *Krasner v. Dreyfus, supra,* 500 F.Supp. at 41. The Court also notes that no objections to the substantive terms of the settlement had been received prior to the August 27th decision, *id.* at 41–42 & n.7, and no shareholder has objected to date. The Court makes the same findings with respect to the *Untermeyer I* settlement. Moreover, based on the supplemental submissions, the Court is satisfied that there has been sufficient discovery to enable counsel to act intelligently in negotiating both settlements encompassing all four actions. Thus, the proponents have met their initial burden.

*Krasner/Gross/Untermeyer II Settlement*

On the question of reasonableness, the Court will first consider the *Krasner, Gross* and *Untermeyer II* settlement. Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a–35(b), imposes on an investment adviser, such as the Dreyfus Corporation [the "Adviser" or "Dreyfus"], a fiduciary duty with respect to the compensation paid for its services by the investment company or its security holders, in this case Dreyfus Liquid Assets, Inc. [the "Fund" or "DLA"]. Accordingly, the Court of Appeals for the Second Circuit has limited the fees that may legally be charged by an adviser to a "fair" amount under traditional equitable principles. *Galfand v. Chestnutt Corp.,* 545 F.2d 807, 811–12 & n.7 (2d Cir. 1976), *cert. denied,* 435 U.S. 943, 98 S.Ct. 1524, 55 L.Ed.2d 540 (1978). Since section 36(b) limits plaintiffs' possible recovery to "actual damages resulting from the breach of fiduciary duty," the maximum recoverable from the Adviser is "the amount by which the 0.5% fee exceeded a fair fee." *Krasner v. Dreyfus, supra,* 500 F.Supp. at 42.

It is immediately apparent how important this fairness question becomes in determining the reasonableness of the proposed settlement. Under *Desimone,* an assessment of the risks of establishing liability

---

2. None of these four actions is a class action. For lack of evidence in the record, the Court expresses no opinion on the ability of defendants to withstand a greater judgment.

and damages as well as the best possible and likely recovery requires consideration of this issue, for if a flat 0.5% fee is fair, then the best possible recovery and likely recovery would be nothing, and the risk of establishing liability and damages would be great. If, on the other hand, 0.5% far exceeds a fair amount, the best possible recovery and likely recovery would be in the millions of dollars and the risk of establishing liability and damages would be small. Thus, if after considering the proposed settlement, the Court leaned toward the latter finding, it would not approve the settlement. The foregoing illustrates why the Court considered it essential that at least some information be provided upon which it could fully evaluate the various factors that might determine the fairness of an advisory fee. Because of the lack of such information prior to its August 27th decision, the Court was compelled to withhold approval of the settlement.

Having reviewed the supplemental materials submitted by the parties, the Court is satisfied that the *Krasner/Gross/Untermeyer II* settlement should be approved. Although it remains true that "to the Court's knowledge there has never been a recovery, on the merits, in a suit claiming excessive advisory fees," Memorandum Decision and Order at 4 (filed June 30, 1978); *see* Note, *Mutual Fund Advisory Fees—Too Much For Too Little?*, 48 Fordham L.Rev. 530, 531 (1980) ["*Mutual Fund Advisory Fees*"] and thus there is no judicial precedent for determining the fairness of an advisory fee, the Court identified seven factors in the August 27th decision which fairly encompass the relevant considerations. *See Krasner v. Dreyfus, supra,* 500 F.Supp. at 42; *Mutual Fund Advisory Fees, supra,* at 545–46.

The Court notes that the *Krasner/Gross* plaintiffs and the defendant Adviser disagree as to the proper emphasis to be given to the various factors. Plaintiffs would have the Court rely more heavily on a strict comparison of the fee at issue to the fees paid by competitive funds of reasonably comparable size. The Adviser argues, however, that the Court should give due regard to the business judgment of the Fund's non-interested directors and therefore that fairness should be determined primarily by evaluating those directors' efforts in approving the fee. Since it is neither the Court's purpose nor intention to decide precisely the method by which a fair fee would be determined following a trial on the merits, it declines to resolve this dispute at this time. This question is more appropriately left to those courts that in the future reach the issue on the merits rather than in the context of a settlement. In the settlement context, the Court is called upon to make two different judgments. *First*, to assess plaintiffs' risk of establishing liability and damages and their best and probable recovery, the Court must attempt to ascertain whether the Adviser's present flat 0.5% fee is "fair" within the meaning of the Investment Company Act. *Second*, the Court must determine whether the terms of the settlement are fair and reasonable in view of plaintiffs' probability of success and likely recovery if the fairness of the advisory fee were determined after a trial on the merits. Rather than determining the relative importance of each factor, the Court, in making both assessments, will examine the seven factors in a light most favorable to plaintiffs' recovery if the claims were fully litigated. If, after having considered these factors in a manner that maximizes plaintiffs' possible litigation success, the Court finds that the settlement is reasonable, then a fortiori the settlement would still be reasonable even if the factors were considered in a light less favorable to plaintiffs.

### 1. *Nature, quality and extent of services rendered*

Under their existing relationship, the Adviser provides the Fund with a broad range of services in essentially two general areas: investment decision-making and administration. The investment decision-making area primarily includes portfolio management and investment research, while administration encompasses executive, accounting, trading, shareholder, legal, and data processing services. In addition, the

Adviser performs all marketing and underwriting functions pertaining to Fund transactions and provides the Fund with office space and office equipment. According to the Fund's non-interested directors, the Adviser has displayed great expertise and skill in these areas and is a leader and innovator in the industry. Therefore, the Court finds that the Adviser provides a wide range of services of a high quality.

### 2. Extent to which economies of scale and common management are shared with the Fund

The most important manner in which economies of scale are shared with the Fund is through a sliding-scale management fee that decreases as the Fund's assets increase. Although the present fee is a flat 0.5%, under the settlement the sliding-scale fee schedule cannot be increased without court approval at least through 1986, which means the Fund's shareholders will reap benefits therefrom despite the effect of inflation on the Adviser's expenses. The Court recognizes that few other benefits can accrue to the Fund because of economies of scale, since the services provided to shareholder accounts and the various other money market and mutual funds administered by the Adviser are so individualized in nature.

### 3. Comparison of investment advisory fees in the industry

The Court's own research in this area, as explained in the August 27th decision, revealed that two money market funds—Merrill Lynch Ready Assets Trust ["Merrill"] and InterCapital Liquid Asset Fund Inc. ["InterCapital"]—have "substantially more favorable fee structures" than DLA, see Krasner v. Dreyfus, supra, 500 F.Supp. at 44, although the Court recognized that its analysis was limited by a lack of complete information. The parties have therefore gone to great lengths to clear up any confusion in this area. Based on the material submitted, the Court is satisfied that both the present 0.5% fee and the proposed sliding-scale fee schedule are comfortably within the range of relevant comparable fees.

The Adviser concedes that the fee it charges the Fund is somewhat higher than the management fees charged to the Merrill and InterCapital funds, but points out that those two funds are both "broker-sponsored" funds with considerably different characteristics from DLA, a "general purpose" fund. Large brokerage houses such as Merrill Lynch & Co., Inc. ["Merrill Lynch"], which administers through subsidiaries the Merrill fund, and Dean Witter Reynolds Organization, Inc. ["Dean Witter"], which administers through subsidiaries the InterCapital fund, establish money market funds for use by their own customers as a vehicle for temporarily investing funds that have been withdrawn from the stock and bond markets but are likely to be reinvested in those markets. The brokerage house's objective is to retain customers who might otherwise take their funds elsewhere and to attract new brokerage-account customers from fund shareholders.

Since the revenues generated by brokerage commissions from stock and bond transactions far exceed the revenues generated by money market management fees, this sales strategy is financially beneficial for such brokerage houses. Moreover, the broker-sponsored fund management expenses are kept relatively low because the cost of the services provided by an account executive to the fund shareholder are absorbed by the broker-dealer as just another aspect of the ongoing business relationship between the account executive and his personal customers. As long as the customer also trades in the stock and bond markets, thereby generating commissions for the broker-dealer, it is economically worthwhile for the account executive to devote part of his time to servicing the customer in the latter's role as a fund shareholder. Costs are further defrayed because the money market fund services are provided through the same distribution and support personnel and facilities as the other services provided by the brokerage house.

General purpose funds, such as DLA, operate somewhat differently. These funds

seek investments solely from the general public, rather than from existing customers of an affiliated broker-dealer, and are therefore unable to defray operating costs in the same manner as a brokerage house. The money market fund is the only investment that the customer makes as far as the managing adviser is concerned. Therefore, the adviser must bear all costs of servicing the shareholder, such as answering questions about current yields, transfers, liquidations and other matters, which requires the adviser to maintain staff and support facilities and to make long-term financial commitments.

Given the differences between broker-sponsored funds and general purpose funds, the Court agrees that it is not particularly helpful to compare the management fees paid by the Merrill and InterCapital funds to the fee paid by DLA. It is more accurate to compare the advisory fee paid by DLA to the fees paid by the nine other mutual funds managed by Dreyfus, as well as to the fees paid by other general purpose money market funds to their respective investment advisers.

The management fees charged by the Adviser to the ten funds it manages range from 0.5% to 0.75%. All three money market funds, including DLA, pay 0.5%. Therefore, the fee at issue here obviously compares favorably to other fees charged by the Adviser.

Among the seven other competitive general purpose funds of reasonably comparable size for which figures have been provided, the DLA 0.5% fee falls within the range of 0.3% to 0.72%.[3] The average advisory fee for all eight funds is approximately 0.48%. In addition, the effective rate under the settlement's sliding-scale fee schedule is 0.48% assuming $3 billion in average daily net assets[4] and 0.47% assuming $6 billion in average daily net assets.[5] Thus, although some funds benefit from a lower manage-

ment fee, the fee paid by DLA compares favorably overall.

The parties have stressed the importance of comparing the "expense ratios" of the various general purpose funds as well as management fees. A fund's expense ratio is the percentage that the sum of the management fee plus all other expenses borne by the fund bears to the average market value of the fund's net assets for the fiscal year. Because the range of services provided by investment advisers varies from fund to fund, some funds may pay separately for certain services that are included in Dreyfus's management fee for services provided to DLA. Therefore, to compare management fees fairly, the Court must compare overall expenses, and, since expenses will necessarily vary with the size of a fund, a comparison of expenses requires a consideration of expense ratios. If another investment adviser's fee is less than the one at issue herein, it may simply reflect that adviser's assumption of a lesser proportion of overall expenses.

The eight general purpose funds have an average expense ratio of 0.7%, with a range of 0.46% to 1.08%. DLA's expense ratio is 0.67%, which is equal to or below the expense ratios for five of the other seven general purpose money market funds. Thus, since a management fee can only be considered unfairly high if the expense ratio to which it corresponds is also abnormally high, the fee paid by DLA to Dreyfus compares favorably with advisory fees paid by competitive and similar funds.

### 4. Value of other benefits received by the Fund

There is no question that in return for the 0.5% fee, Fund shareholders receive numerous other benefits as a result of the Adviser's efforts. Among other things, the Adviser secured the Securities and Ex-

---

**3.** Fidelity Daily Income Trust recently obtained shareholder approval for an increase in its current management fee of 0.3%.

**4.** At the time of the August 27th decision, the Fund's average daily net asset value was ap-

proximately $3 billion. See Krasner v. Dreyfus, supra, 500 F.Supp. at 43.

**5.** The Fund's average daily net asset value at present is approximately $6 billion.

change Commission's ["SEC"] approval of the Fund's practice of pricing its shares at $1.00, which makes it more convenient for shareholders to determine the value of their holdings and maintain an accurate investment record by simply referring to the number of shares they own. Moreover, the Fund distributes net investment income on a daily basis, declares and pays dividends on business days, and automatically reinvests dividends and distributions in additional Fund shares. Quarterly summaries of individual accounts are provided and regular distribution plans and automatic withdrawal are available. The minimum investment is a relatively low $2,500, and shareholders can write checks on their accounts and exchange their shares for shares of other funds administered by the Adviser. In all, the services provided are extensive and apparently well received by the shareholders.

### 5. Director approval and shareholder ratification

Section 36(b)(2) of the Investment Company Act requires the Court to consider fund directors' approval and shareholder ratification of an advisory agreement in determining whether the investment adviser has breached its fiduciary duty. The Act does not specify the weight to be accorded thereto, however, so that such approval and ratification should not be considered conclusive on the issue of a fee's fairness.

The advisory fee at issue was approved each year from 1974 to 1980, as part of the management agreement, by unanimous vote of the Fund's non-interested directors. The management agreement was first submitted for shareholder approval in 1974, after full disclosure in the relevant proxy materials. At that time, the shareholders ratified the agreement by a vote of approximately 5,000,000 to 70,000, or 98.6% in favor and 1.4% against. The terms of the management agreement, as amended from time to time, have always been disclosed in Fund prospectuses, and are also described in the annual proxy materials sent to the shareholders. Moreover, the non-interested directors have twice unanimously approved the settlements of these actions, and no shareholder has objected to the proposed amended settlement. In short, all relevant approvals of the advisory fee have been repeatedly secured, which would support an ultimate determination of fairness.

### 6. Adviser's disclosure of pertinent information

Section 15(c) of the Act, 15 U.S.C. § 80a–15(c), requires the investment adviser to provide fund directors with "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser" to the fund. It is evident to the Court that the Adviser has always met this obligation. On a regular basis, it supplies DLA's board of directors with statistical data reflecting the investment performance of the Fund as compared to competing funds, an explanation of the services it provides, and other relevant information such as industry financial publications, prospectuses and financial reports of other money market funds, and Dreyfus's own annual report. Moreover, the most recent management contract booklet, which is provided each year in advance of the Fund's board of directors meeting held to consider the management agreement, includes, inter alia, an explanation of the Investment Company Act and relevant case law, a discussion of the Adviser's view of its function and goals, financial statistics concerning the Dreyfus's mutual fund operations, and a schedule of costs allocated between the Fund and the Adviser.

### 7. Directors' deliberations

Section 15(c) of the Act further requires the directors of a fund to request and evaluate the same type of information that the Adviser is obligated to provide. The Court is satisfied that the directors, all of whom are reputable people in business and the professions, have done just that. In addition, under section 15(c), a management agreement can only be approved by a majority of non-interested directors appearing in person at a special meeting called for

that purpose. As noted previously, this requirement was met in this case.

The board meetings held to approve the management agreement were conducted in the following manner. Each meeting was attended by both the Fund's independent counsel, who advised the non-interested directors of their fiduciary obligations, and personnel from Dreyfus, who provided information and answered questions. When the non-interested directors were satisfied that they had received sufficient information, the Dreyfus personnel left the meeting, and the non-interested directors continued their discussions in private, with their attorney present. At each such meeting, the management agreement was approved unanimously by the non-interested directors. In short, the deliberations of the directors were a matter of substance rather than a mere formality.

Having reviewed the seven factors relating to fairness, the Court now turns to the ultimate issue under *Desimone*, namely, whether the settlement is reasonable in light of plaintiffs' ultimate probability of success in the lawsuit. 83 F.R.D. at 618. As noted above, plaintiffs have emphasized the difference between the Adviser's 0.5% fee herein and the somewhat lower fees charged to certain competitive funds of reasonably comparable size, thereby focusing on the third of the seven factors. Indeed, plaintiffs' counsel has represented that if these cases were to proceed to trial he would seek to prove liability and damages based on a strict comparison of the 0.5% fee to the lowest of the competitive fees. Viewed in this light, plaintiffs' ultimate probability of success in the lawsuit is considerably enhanced. Although the Court will not rule on whether this would be a permissible manner in which to proceed at trial, a settlement found to be reasonable under plaintiffs' theory of the case would be reasonable under any other theory of case, in which factors less favorable to

plaintiffs would be accorded greater weight. Therefore, the Court will adopt plaintiffs' theory solely for the purpose of assessing the reasonableness of the settlement.

Of the seven competitive general purpose funds of reasonably comparable size, only two pay a fee that is substantially less than 0.5%—Fidelity Daily Income Trust ["Fidelity"] pays 0.3% [6] and Rowe Price Prime Reserve ["Rowe"] pays 0.4%. Assuming that these fees would be found to be fair, meaning that plaintiffs' probability of success is high, the best possible recovery would be the difference between the total fees charged by the Adviser during the relevant recovery period and the fees it would have charged during that period had the lower rates been in effect. The recovery period is limited to the twenty-eight months between March 29, 1975 [7] and July 27, 1977, since the stipulation of settlement and the amendment thereto provide that all claims for excessive fees arising prior to July 27, 1977 shall be dismissed with prejudice.

During the recovery period the Fund paid approximately $10 million to the Adviser in advisory fees, based on the average daily net assets of the Fund throughout this period. If the fee had been 0.3%—the Fidelity fee—the Fund would have paid $6 million in fees, and if the fee had been 0.4%—the Rowe fee—the Fund would have paid $8 million. Thus, if the Fidelity fee were determined to be the fair fee, the best possible recovery would be $4 million, and if the Rowe fee were determined to be the fair fee, the best possible recovery would be $2 million.

Under the original settlement, $2.34 million is likely to be paid to the Fund through 1986, due to the growth of the Fund, and, under the amended settlement, an additional $480,000 is likely to be paid, for a total of $2.82 million. This constitutes 71% of the best possible recovery if 0.3%, the lowest of

**6.** *See* note 3 *supra.*

**7.** Under section 36(b)(3) of the Investment Company Act, the recovery period begins no earlier than one year prior to the commence-

ment of the suit. 15 U.S.C. § 80a–35(b)(3). The *Krasner* action, the oldest of the three lawsuits encompassed by this settlement, was commenced March 29, 1976.

all the fees, is the fair fee, and 141% of the best possible recovery if 0.4% is the fair fee. Moreover, if the Court were to find that the average of all the comparable fees—0.48%—is the fair fee, the maximum recoverable would be $400,000, which the settlement amount exceeds by 700%. In light of the usual risks inherent in complex litigation, even 71% of the best possible recovery appears reasonable, and the other figures are extraordinarily favorable to the Fund.

The immediately preceding analysis, of course, ignores all the other factors discussed above, especially the shareholders and non-interested directors' overwhelming approval of the management fee on every relevant occasion. Thus, the likelihood is that at trial the Court would not limit the evidence on fairness to a strict comparison of fees. Therefore, the best possible recovery is probably much less than $4 million, thereby greatly increasing the risk of establishing liability. Moreover, plaintiffs would incur substantial additional expense if the litigation were to proceed through trial and the appellate process, a fact apparently not lost on the shareholders, who have reacted favorably to the settlement.

■ The Court is also satisfied that the sliding-scale fee schedule, which is to remain in effect through 1986 unless increased with Court approval or decreased by the parties, will result in further benefits to the class. In 1980 alone, the fee schedule would add $500,000 to the amount recouped by the Fund, based on average daily net assets of $3 billion. In any event, having considered the seven fairness factors, the Court cannot say that the schedule is unfair in light of the other settlement arrangements. Accordingly, the Court finds the proposed settlement to be fair, reasonable and adequate, and hereby approves it.[8]

8. Counsel for the *Krasner/Gross* plaintiffs and Dreyfus have engaged in a battle of letters over whether the settlement will have res judicata effect on claims arising after July 27, 1977. Under normal circumstances, the Court would simply ignore such communications entirely.

*Untermeyer I Settlement*

Turning now to the *Untermeyer I* settlement, the Court is satisfied that it is reasonable in light of plaintiff's ultimate probability of success. In brief, this action charges that the Fund violated section 22(c) of the Investment Company Act, 15 U.S.C. § 80a–22(c), by valuing its portfolio securities at below fair market value. This valuation, it is alleged, increased the Fund's reported yield to a rate higher than it would have been had the portfolio been valued in the proper manner, thus misleading prospective investors. The parties agreed to settle the dispute provided the Fund includes in its prospectus a disclosure provision with respect to valuation, as set forth in full in the August 27th decision. *See Krasner v. Gross, supra,* 500 F.Supp. at 40.

As indicated above, the proponents of the settlement have met their initial burden. On the question of reasonableness, the Court notes the following. The primary relief sought in the complaint is an injunction requiring valuation of the portfolio at fair market value. After conducting extensive discovery on various methods of valuation, and after the commencement of SEC proceedings which may result in the uniform regulation of portfolio valuation, plaintiff decided that its major contention was simply that the Fund's failure to disclose its method of valuation was potentially misleading. Thus, counsel believed that investor confusion and the potentially improper benefit to the Fund resulting therefrom could be eliminated by disclosing (1) the Fund's valuation method and that of other money market funds and (2) the possibility that the Fund's reported yield might thereby be inflated. Moreover, counsel determined that it would be difficult to establish the extent to which the Fund was damaged—although the proceeds from new sales were arguably lower than what the

Nevertheless, the Court would like to note its agreement with both parties that this issue is not now before the Court and that its resolution is not necessary to the present decision. Therefore, the Court expresses no opinion as to the issue's resolution.

Fund would have received if its shares were valued at net asset value, the Fund is at the same time benefited since shareholders are constantly liquidating their investments at the assumed net asset value, meaning that the Fund pays out a relatively low amount on redemption. Thus, if the Fund did sustain losses by selling its shares at too low a price, it would ultimately recoup those losses by making redemptions at an equally low price.

In light of the foregoing, by settling *Untermeyer I* in the manner indicated plaintiff has essentially prevailed on his claim and obtained the most likely recovery.[9] The risk of establishing liability is difficult to determine, but in any event continued litigation would be expensive. The shareholders have not, of course, objected to the settlement. The Court accordingly finds the settlement to be fair, reasonable and adequate, and hereby approves it.

### Attorneys' Fees in Krasner and Gross

When the Court initially approved the settlement of these actions on June 30, 1978, it also approved a joint application for attorneys' fees and expenses brought by the firm of Pomerantz Levy Haudek & Block [the "Pomerantz firm"], attorneys for plaintiff Krasner, and the firm of Lowey, Dannenberg & Knapp, P.C. [the "Lowey firm"],[10] attorneys for plaintiffs Meyer and Karen Gross, in the amount of $270,000. For their efforts in opposing the appeal to the Second Circuit and in negotiating the consolidated settlement of all four actions, plaintiffs' attorneys now seek an additional $80,000 in fees and expenses. They do not, however, seek fees and expenses for services rendered since the August 27th decision. Of the total $350,000 requested, $7,407.30[11] constitutes expenses. The following charge illustrates the breakdown of the fee request:

| Attorney | Hours | Non-Contingent Billing Rate Per Hour | Total |
|---|---|---|---|
| Abraham L. Pomerantz | 608.25 | $200 | $121,650.00 |
| Julius Levy | 97.75 | 175 | 17,106.25 |
| William E. Haudek | 92.60 | 175 | 16,205.00 |
| Daniel W. Krasner | 194.21 | 100 | 19,421.00 |
| Arnold Gershon | 222.00 | 75 | 16,650.00 |
| Stephen P. Hoffman | 122.08 | 60 | 7,324.80 |
| | 535.01 | 85 | 45,475.85 |
| Richard B. Dannenberg | 157.10 | 125 | 19,637.50 |
| | 14.50 | 175 | 2,537.50 |
| Burton L. Knapp | 7.30 | 125 | 912.50 |
| Neil L. Selinger | 20.75 | 65 | 1,348.75 |
| Totals | 2,071.55 | | $268,269.15 [12] |

Under the equitable fund doctrine, the Court has the general equitable power to award fees out of the settlement fund to attorneys who have conferred a benefit on

---

9. The Court notes that the Fund is further benefited by the fact that Untermeyer's attorneys' fees will be paid by Dreyfus since, under the settlement, the Fund will not obtain a monetary recovery.

10. Lowey, Dannenberg & Knapp, P.C. is successor to the firm of Lipper, Lowey & Dannenberg and Burton L. Knapp, which previously represented plaintiffs in the *Gross* action.

11. *See* note 12 *infra*.

12. Counsel has listed 52.5 hours of "law assistant" time, valued at $1,837.50, as part of the attorneys' fee request. This item is properly reportable as an expense and has therefore been added to the $5,569.80 expense request, resulting in a total expense request of $7,407.30.

a group, such as the DLA shareholders. *See City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir. 1977) [*"Grinnell II"*]; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 469–70 (2d Cir. 1974) [*"Grinnell I"*].[13] To ensure just compensation without injuring the rights of the shareholders, the Court must limit the award to the " 'reasonable value of services benefiting ... the claimant.' " *Id.* at 470 (quoting *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973)). By calculating the number of hours that plaintiffs' attorneys reasonably spent on the case, and then multiplying that figure by the reasonable value of the attorneys' services, the Court can determine the "lodestar" figure. *Grinnell II, supra,* 560 F.2d at 1098; *Grinnell I, supra,* 495 F.2d at 470–71. Once the lodestar is established, the Court may consider other factors to determine a final fee amount, "such as the 'risk of litigation', the complexity of the issues, and the skill of the attorneys." *Grinnell II, supra,* 560 F.2d at 1098. The Court accepted evidence on these issues in affidavit form.

As noted above, plaintiffs' counsel seek an award of fees and expenses of $350,000 out of the total benefit to the Fund of at least $2.82 million.[14] Counsel claim to have expended a total of over 2,071 hours on this litigation, including time spent on pleadings and motions, discovery, court appearances and the preparation therefor, legal research and writing, settlement negotiations and approval, the appeal, further settlement negotiations and approval, and general case strategy, planning and administration. Having carefully reviewed the affidavits and time records submitted, the Court finds that the number of hours and billing rates claimed are fair and reasonable as consistent with the nature and scope of this litigation and the normal hourly rates charged by attorneys practicing before this Court in similar matters. Furthermore, it appears there has been little or no duplication of effort, and that counsel divided the work efficiently. Therefore, the lodestar is $268,269.15.

██ The fee request of $342,592.70 represents a multiple of 1.28 of the lodestar figure. In light of the previously noted complexity of this action and the uncertainty plaintiffs faced in proving liability and damages, the risk factor was great. Moreover, the quality of legal services provided by plaintiffs' counsel, who are among the acknowledged leaders in their specialty, was of the highest caliber and consonant with the Court's expectation of attorneys with their skill and experience. Indeed, this skill is reflected in the settlement achieved which is clearly favorable to the Fund. Finally, the Court appreciates that there has been no fee request for the final stage of this litigation, from last August 27th until now. Thus, the 1.28 risk multiplier, which is considerably less than the 2.1 risk multiplier approved in 1978, is appropriate, and the Court accordingly approves the Pomerantz and Lowey firms' application for $350,000, including expenses.

*Attorneys' Fees in Untermeyer I and II*

The firm of Silverman & Harnes, attorneys for plaintiff Untermeyer in both *Untermeyer* actions, seeks an award of $100,000 in fees and expenses. As part of the consolidated settlement, Dreyfus will pay Untermeyer's counsel fees, if approved by the Court. Counsel has not distinguished between fees and expenses, which is a practice this Court does not favor but will permit in this instance because of the reasonableness of the fee request and the manner in which the fees will be paid. The firm's partners, Joan T. Harnes and Sidney B. Silverman, claim to have expended 1,008.25 hours on both cases, and their associate, Martin H. Olesh, claims to have expended 141 hours, for a total of 1,149.25 hours.

13. The Court therefore rejects the objections of two shareholders who contend that any award of fees should be paid by the Adviser and not the Fund.

14. The fee request amounts to 12.4% of the total benefit to the Fund.

Counsel explain that approximately 300 hours were devoted to *Untermeyer I* and approximately 850 hours were devoted to *Untermeyer II*, spread among the same various litigation activities as mentioned above in the discussion of attorneys' fees in *Krasner* and *Gross*.

The previously stated principles governing fee awards apply equally to the Silverman & Harnes request. The Court has reviewed the affidavits and time records submitted, and finds that the number of hours claimed is reasonable in light of the nature and scope of the litigation. Billed at counsel's normal hourly billing rates—$150 per hour for partners' time and $65 per hour for associates' time—the 1,149.25 hours expended would generate total fees of $160,402.50. These billing rates are equal to or less than those charged by the Pomerantz and Lowey firms, and are consistent with billing rates charged by attorneys practicing before this Court in similar matters. Thus, the lodestar is $160,402.50.

▪ In light of the foregoing, counsel's request for $100,000 is eminently reasonable, especially since no part of this amount will be paid by the Fund shareholders. Counsel represents to the Court that, with respect to *Untermeyer I*, they sought payment from the Adviser because no monetary benefit would accrue to the Fund under the settlement. With respect to *Untermeyer II*, counsel represents that they sought to avoid having the Fund pay the fees for the *Krasner* and *Gross* plaintiffs and then pay an additional amount to Untermeyer's attorneys when *Krasner/Gross* counsel were primarily responsible for the settlement and *Untermeyer II* counsel merely helped secure additions and improvements thereto. In any event, the Court appreciates counsel's efforts in securing an extra benefit to the Fund by reducing its counsel fees. Accordingly, the Court approves counsel's application for $100,000 in attorneys' fees, including expenses, to be paid by Dreyfus.

## CONCLUSION

In accordance with the foregoing, the Court approves the proposed consolidated settlement of these four shareholder derivative actions. Fed.R.Civ.P. 23.1. The Court also grants (1) plaintiffs' application for attorneys' fees, costs and disbursements in *Krasner v. Dreyfus Corp.*, 76 Civ. 1478 (JMC), and *Gross v. Dreyfus Corp.*, 76 Civ. 4010 (JMC), in the amount of $350,000, to be paid by Dreyfus Liquid Assets, Inc., and (2) plaintiffs' application for attorneys' fees, costs and disbursements in *Untermeyer v. Dreyfus Liquid Assets, Inc.*, 76 Civ. 184 (JMC), and *Untermeyer v. Dreyfus Liquid Assets, Inc.*, 78 Civ. 5636 (JMC), in the amount of $100,000, to be paid by the Dreyfus Corporation.

Submit Consent Judgment.

SO ORDERED.