Anthony P. DESIMONE and Lucy Maddaloni, Plaintiffs,

v.

INDUSTRIAL BIO–TEST LABORATORIES, INC., Albert Bowers, Ralph I. Dorfman, George Rosenkranz, Richard Rogers, Kenneth Carter, Syntex Corporation, Syntex (U.S.A.) Inc., David H. Hanlon, Nicholas P. Vida, Burton L. Rogers and Alexander D. Cross, Defendants.

Henry LLOYD, Plaintiff,

v.

INDUSTRIAL BIO–TEST LABORATORIES, INC., Albert Bowers, Ralph I. Dorfman, George Rosenkranz, Richard Rogers, Syntex Corporation, Syntex (U.S.A.) Inc., Burton L. Rogers and Alexander D. Cross, Defendants.

Nos. 76 Civ. 3506 (LFM), 77 Civ. 5823 (LFM).

United States District Court, S. D. New York.

Oct. 2, 1979.

Milberg, Weiss, Bershad & Specthrie by David J. Bershad and Sharon Levine Mirsky, New York City, Wolf, Popper, Ross, Wolf & Jones by Donald N. Ruby, New York City, for plaintiffs Desimone and Maddaloni.

Rabin & Silverman by I. Stephen Rabin and Allan K. Peckel, New York City, for plaintiff Lloyd.

Simpson, Thacher & Bartlett, New York City, Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for defendant Industrial Bio-Test Laboratories, Inc.

Holtzmann, Wise & Shepard by David R. Foley, New York City, Shea, Gould, Climenko & Casey by Milton S. Gould, New York City, for defendants other than Industrial Bio-Test Laboratories, Inc.

## OPINION

MacMAHON, District Judge.

The parties in this consolidated securities fraud class action apply for approval of a proposed settlement under Rule 23(e), Fed. R.Civ.P. Plaintiffs' counsel also apply for allowances of attorneys' fees and expenses.

Plaintiffs, purchasers of Syntex Corporation stock and options, allege that defendants Syntex Corporation, one of its subsidiaries, certain of its officers and directors (the "Syntex defendants"), and Industrial Bio-Test Laboratories, Inc. ("IBT") committed common law fraud and violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. The nub of the allegations is that in obtaining approval from the United States Food and Drug Administration ("FDA") to market Syntex's drug, Naprosyn, the Syntex defendants submitted to the FDA a report, prepared by IBT, that contained false and misleading statements regarding Naprosyn's toxicity to humans. When the FDA later learned of the report's unreliability, it commenced proceedings to withdraw Naprosyn's approval, with the result that Syntex's stock and options prices dropped.

Plaintiff Desimone, a stock purchaser, commenced this action on August 6, 1976. Later, in September 1976, plaintiff Maddaloni, also a stock purchaser, brought an action in the United States District Court for the Northern District of California. The California action was transferred here and consolidated with the *Desimone* action by our order of June 6, 1977. On the same date, we ordered conditional certification of this consolidated action (the "*Desimone* action") as a class action on behalf of all persons who sustained damage as a result of their purchase of Syntex common stock during the period from October 13, 1975 through August 6, 1976 (the "stock class").

Plaintiff Lloyd, purchaser of an option to purchase Syntex stock, brought his action here on December 2, 1977. We ordered consolidation with the stock class action and designated as co-lead counsel the two law

firms representing the stock class. We twice denied certification of the option class.

After extensive discovery and with the trial date near, counsel, in February 1979, negotiated a stipulation of settlement of all claims for approximately $2,900,000. We then entered an order for purposes of such settlement only allowing the *Lloyd* action to proceed as a class action on behalf of all persons who sustained damage as a result of their purchase of options to purchase Syntex common stock during the period from October 13, 1975 through August 6, 1976 (the "option class").

Pursuant to our order of May 8, 1979, notice of the proposed settlement was mailed to the stock and option class members and published in the national edition of the Wall Street Journal. The notice outlined the terms of the settlement and the fees and expenses sought by plaintiffs' counsel, gave notice of a hearing on those matters to be held July 30, 1979, and informed class members of their rights to object to the arrangement and to opt out of the settlement. On July 30, 1979, we held the noticed hearing, and there were no objections to the settlement and requested fees and expenses.

We now consider the propriety of the settlement and the fee applications.

### The Settlement

The stipulation of settlement provided that defendants were to contribute $2,750,000 to a settlement fund, and they did so in February 1979. Should distribution be approved, the total fund will contain that contribution plus interest, which as of July 30, 1979 amounted to $125,000. Proponents estimate that by the time of payout the fund will contain about $3,000,000. Lawyers' fees and litigation expenses are to be paid out of this fund, and plaintiffs' counsel

have stipulated that total fees are not to exceed $900,000. In addition, the Syntex defendants have agreed to reimburse up to $50,000 of the expenses incurred by plaintiffs' counsel in the notification and administration of the settlement. Such expenses to date total $33,526.33.

The court will approve a proposed settlement of a class action if the proposal is fair, reasonable and adequate. This determination requires three levels of analysis. First, the proponents have the burden of proving that (1) the settlement is not collusive but was reached after arm's length negotiation; (2) the proponents are counsel experienced in similar cases; (3) there has been sufficient discovery to enable counsel to act intelligently and (4) the number of objectants or their relative interest is small. If the proponents establish these propositions, the burden of attacking the settlement then shifts to the objectants, if any. Finally, the court must approve the settlement only after finding it to be reasonable in light of the plaintiffs' ultimate probability of success in the lawsuit.[1]

We find that the proponents have established the four propositions stated above. The negotiations between plaintiffs' lead counsel and defendants' counsel took place at arm's length.[2] Counsel for the option class were apparently absent from the bulk of the negotiations. Nevertheless, after the lead counsel negotiated a settlement for the option purchasers reimbursing them for 10% of their alleged loss, the option counsel succeeded in increasing this amount to 15%.[3] This fact suggests meaningful participation at arm's length. There is no suggestion of collusion anywhere in the evidence.

All proponents are able and respected counsel with substantial experience in stockholder litigation, federal securities

---

1. *See, e. g., Weiss v. Drew Nat'l Corp.*, 465 F.Supp. 548, 551 (S.D.N.Y.1979); *Feder v. Harrington,* 58 F.R.D. 171, 174–75 (S.D.N.Y.1972).

2. Bershad Affidavit in Support of Settlement 30–31 (hereinafter "Bershad Settlement Affidavit").

3. Peckel Affidavit in Support of Settlement 3 (hereinafter "Peckel Settlement Affidavit").

fraud litigation and class actions.[4] Proponents have shown that the discovery has been extensive and exhaustive. Defendants produced hundred of thousands of pages of documents; plaintiffs conducted more than 45 days of depositions of 41 witnesses; and the parties entered into numerous stipulations of fact so as to focus and narrow the range of contested issues.[5]

The number of objectants and their relative interests appear to be zero. As of July 30, 1979, no class member had objected, and over 4,000 members had submitted claims to share in the settlement fund.[6] Though some persons have requested *exclusion* from the option class, the court is unaware of any objectants.

The proponents have thus clearly borne their initial burden. Since there is no objectant, the court must now engage in determining whether the settlement is reasonable in light of plaintiffs' probabilities of success on the merits. The purpose of this investigation is to assure that the interests of class members absent from the litigation and settlement negotiations remain protected.[7] In protecting these interests, we are not to substitute our business judgment for that of the negotiators who bargained at arm's length, but only to insure that the arrangement is not so unfair as to require disapproval.[8]

In determining reasonableness, the courts in this circuit have not applied any single, inflexible test. Instead, they have considered the amount of the settlement in light of all the circumstances, including such factors as: (1) the best possible recovery; (2) the likely recovery if the claims were fully litigated; (3) the complexity, expense and probable duration of continued litigation; (4) the risk of establishing liability; (5) the risk of establishing damages; (6) the risk of maintaining the class action throughout trial; (7) the reaction of the class to the settlement; (8) the stage of the proceedings and (9) the ability of the defendants to withstand a greater judgment.[9] We will consider these factors in light of the terms of the settlement for each class.

The total amount of the settlement fund at payout would be between $2,900,000 and $3,000,000, out of which counsel seek fees and expenses totalling slightly over $1,000,000. Relative payouts between the classes would differ in one major respect. The claimed loss of each option class member would be reduced to 15% thereof before he was entitled to a proportionate share in the fund, while the claimed loss of each stock member would not be reduced at all. Thus, the option class is to receive a lower relative participation.

The proponents of the settlement have put forth no suggestion as to what the best possible recovery would be, or as to what the likely recovery would be in light of all the litigation risks. Thus, we can make no numerical comparison among actual, possible and probable recoveries to the respective classes.

Continued litigation would be complex, expensive and lengthy. Some issues of liability would require individual determinations as to each defendant. These issues include whether he acted with scienter; whether the fraud of others could be imputed to him as an aider and abettor; and whether he was responsible for their acts on an agency theory. The issues common to all defendants, though few in number, are highly technical and subtle in nature. The question whether the report was false and misleading, for example, would not only require proof of scientific procedures, practices and terminology but also proof of the materiality of the alleged false statements

---

4. Bershad Affidavit in Support of the *Desimone* Plaintiffs' Application for the Award of Attorneys' Fees and the Reimbursement of Expenses 34–40 (hereinafter "Bershad Fee Affidavit"); *Id.* Exhibit C; Peckel Fee Application 5–6.

5. Bershad Settlement Affidavit 13–16.

6. *Id.* at 3–4.

7. *Feder v. Harrington, supra*, 58 F.R.D. at 174.

8. *Id.* at 176.

9. *See, e. g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *Weiss v. Drew Nat'l Corp., supra*, 465 F.Supp. at 551.

to the decision-making process of the FDA. Two novel issues peculiar to the option class are also complex: whether it is a single class, and the applicable measure of damages for each purchaser.

Litigation of these issues and the likely appeals from their initial resolution would consume considerable time and resources. There are expert witnesses on both sides. Plaintiffs' counsel estimate that, including appeals and possible remands, this case would go on for at least two more years absent the settlement.

The risk of establishing liability is high for both classes. The key element in any fraud action is scienter, and it is always difficult to prove scienter. There is considerable question here us to whether the alleged false statements contained in the report were made knowingly or inadvertently. Even assuming knowing falsehoods, the further question remains whether the report, only one of hundreds of studies of Naprosyn, played a material role in the FDA's initial decision to approve marketing of the drug.

Showing scienter of the individual defendants and imputation of it to the corporate defendants also pose difficulties. Most of plaintiffs' evidence on these points consists of documents seven or eight years old that are no longer familiar to the witnesses and are thus subject to varying interpretations. Reliance and causation are also difficult to prove since the FDA's approval of the drug, based on other reports as well as the IBT report, tends to break the link between any wrongdoing by the defendants and the ultimate purchases of securities by the plaintiffs. Finally, key witnesses to plaintiffs' case invoked the privilege against self-incrimination upon their depositions and would be unlikely to testify at trial.

The risk of establishing damages is low for the stock class but high for the options class. Stock purchasers need only demonstrate price differentials between certain dates. Option purchasers, however, face the problem that the value of an option declines as its expiration date approaches even if the underlying stock remains steady; thus, each option purchaser must prove what portion of his loss flowed from defendants' wrongdoing as opposed to the mere passage of time.

Both classes also face differing risks in maintaining the class action throughout trial. The purchasers of stock have only been conditionally certified as the stock class, and we have twice denied certification of the option class under the criteria of Rule 23, Fed.R.Civ.P. The option class has recently been certified by an order based on a stipulation and then only for the purposes of. this settlement. Were a trial to replace settlement, the chances are very slim that the option representative could satisfy the requirements of Rule 23.

As demonstrated above, the reaction of both classes to the settlement has been very favorable. The pretrial proceedings have advanced sufficiently to give all parties a clear idea of their probabilities of success. There has been no evidence on defendants' abilities to withstand a greater judgment.

■ We find in light of all the available evidence that the proposed settlement is reasonable as to both classes. We would be more secure in this finding had proponents submitted estimates of the best possible recovery and of the probable recovery upon continuation of the litigation. We note, however, without condoning the failure to submit such estimates, that the other factors all point in favor of approval, that estimating possible and probable recoveries is very difficult in this case in light of the complexity of the litigation and the peculiarities of option securities, and that securities fraud settlements have been approved in other cases where such evidence was missing.[10]

The advanced stage of the proceedings suggests that the settlement was intelligently conceived with respect to both classes. The lack of objection and the high number of claims submitted both suggest that the class members find the settlement

---

10.  *See Weiss v. Drew Nat'l Corp., supra,* 465 F.Supp. at 551.

reasonable. The high risk of establishing liability supports a settlement that is substantially lower than whatever may be the best possible recovery.

The discount factor applied to option class members is also reasonable in light of the greater obstacles to success facing the option class, namely, the complexities introduced by the option factor, the greater risk of establishing damages, and the greater risk of maintaining the class action throughout the trial.

### Attorneys' Fees and Expenses

Plaintiffs' counsel have submitted two applications for fees and expenses. The two law firms representing the stock class ("stock counsel") submitted a joint application seeking a fee of $885,000 and expenses of $126,342.01 to be paid out of the settlement fund; in addition, pursuant to the stipulation, they seek reimbursement from the Syntex defendants of $33,526.33 to cover accrued class notification and administration expenses and leave to recover up to a total of $50,000 from such defendants for additional expenses of administering the settlement. The law firm representing the option class ("option counsel") seeks $50,000 in fees and $224.24 in expenses out of the settlement fund.

We have general equitable power to award fees out of the fund to those who have brought a benefit to the class members. We must review the fee applications with a view to awarding just compensation to the lawyers for their work while protecting the rights of the class members.[11]

The *Grinnell* case requires that an evidentiary hearing be held to determine the propriety of the fee. Since there were no objectants at the July 30 hearing, we accepted evidence in affidavit form rather than require testimony that would go uncontroverted.

Since the purpose of a fee is to compensate the lawyers for the value of their work, our analysis must start by evaluating the time they spent on the case. This is done by taking the time spent by each partner and associate on the case and multiplying the hours by a reasonable hourly rate determined by what a lawyer of like skill in the area would get.[12]

Both applications contain affidavits setting forth the time spent by each lawyer and multiplying that time by the rate at which that lawyer's time is currently billed. Stock counsel have also done this for paralegal time. Based on these computations, stock counsel value their time at $692,854.30, and option counsel value theirs at $28,008.65.

We think these valuations are too high. For one thing, *Grinnell* teaches that paralegal time is to be reimbursed as an expense, not counted as lawyers' time which is subject to increase by a risk factor bonus.[13] Second, the hourly rate to be applied is not the current rate but the rate in force when the work was done.[14] In view of stock counsel's estimate that the consumer price index went up 25% since the institution of these actions, it is likely that billing rates have increased similarly since work began on these cases in 1976 and 1977. Third, the valuation of a lawyer's time should vary with the type of work he or she does. Routine or clerical matters should receive a lower valuation than complex ones;[15] yet option counsel, who spent at least some time copying documents, billed this activity at the same rate as other services.[16] Fourth, though option counsel's affidavit clearly delineates the projects that each lawyer worked on, stock counsel's affidavit does not.

11. *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 470–71.

12. *Id.*

13. *Id.* at 473.

14. *Weiss v. Drew Nat'l Corp., supra*, 465 F.Supp. at 552; *Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054, 1055 (S.D.N.Y.1977).

15. *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 471.

16. Peckel Fee Application 2–3.

We are thus unable to tell whether and to what extent the 18 stock lawyers duplicated each other's work or did primarily routine tasks. It is certain, however, that of the 6,273.55 hours spent by those lawyers—about 156 man weeks—some must have been duplicative or unproductive.

■ We recognize, of course, that an over exacting reconstruction of the time spent by each lawyer in this litigation on each particular type of task during each year might cause more problems than it would solve. Nevertheless, the burden of justifying a fee claim falls on the applicant, and the uncertainties arising from inexplicitness must, in fairness to the class members, be resolved against the lawyers who are sharing in the fund.[17]

Application of this rule is particularly appropriate in this case. The larger, longer and more complex the litigation, the greater the possibility that overstatements will creep into the figures, no matter how carefully they are compiled. Accordingly, the courts in this circuit have repeatedly called for detailed affidavits justifying the size of the fee claimed and have set forth precise rules governing the calculation of fees. The applicants here are specialists in plaintiffs' class action representation and thus must be strictly held to the courts' requirements. Yet the requisite details are in large part absent from the affidavits submitted here.

Accordingly, we reduce the submitted time valuations as follows:

As to stock counsel, paralegal time will be treated as an expense, thus reducing the initial valuation of stock counsel's time to $633,088.80. This figure will be reduced by 33% to offset the use of current inflated rates, the use of maximum charges for all types of work, and the probability of duplicative effort. We find the value of stock counsel's time to be $424,169.50.

Option counsel, who used no paralegals, will start with their initial valuation of $28,008.65. This figure will be reduced by 15%, yielding a final valuation of $23,807.38. The lower reduction factor results from several considerations. First, while stock counsel began work on the case in August 1976, option counsel did not come in until December 1977. It is thus likely that any increase in option counsel's hourly rates since they began work is smaller than increases in stock counsel's rates. Second, option counsel's more detailed affidavit reveals that each lawyer worked almost exclusively on research, drafting and strategy rather than on tasks requiring less legal acumen. Finally, the affidavit's breakdown regarding which lawyers worked on each project shows that the possibility of duplication was minimal.

■ Once the lawyer's time has been valued, the figure obtained must be increased to reflect the risk of nonpayment inherent in contingent fee arrangements such as these. Had the lawyers here been unsuccessful in their efforts against defendants, they would have received no compensation, a result familiar to both counsel. The "risk factor bonus" for successful representation exists to insure that lawyers will champion rights that might otherwise go unprotected.

■ The "risk factor bonus" depends upon counsel's probability of success had the case gone to trial. The lower the probability of success (or the higher the risk of litigation), the higher should be the bonus.[18] As our analysis of the settlement agreement has shown, the two classes had different probabilities of success on the merits. Accordingly, a different bonus should apply to each counsel's time valuation.

The substantial risks of litigation faced by stock counsel were set forth earlier. The issues of scienter, materiality and causation, as well as questions of imputed liability, were all hotly contested. Key plaintiffs' witnesses were refusing to testify. Plaintiffs received no help from pending litigations. Stock counsel faced formidable

---

**17.** *Weiss v. Drew Nat'l Corp., supra,* 465 F.Supp. at 553.

**18.** *Id.*

opposition from defendants' prestigious counsel, but nevertheless completed extensive discovery and achieved conditional class certification.

■ Recent cases have awarded bonuses between zero and 30%.[19] We think that the risks in this case warrant a bonus of 20%. This bonus should apply only to the time spent on the merits since only that time was at risk. The bonus will not apply to time spent on the motion to approve the settlement and on the fee application.[20]

Stock counsel's affidavit does not reveal what portion of the total time was spent on the latter projects, so we resolve the inexplicitness against counsel. We hold that $20,000 of stock counsel's time value is not subject to the "risk factor bonus." Accordingly, we award to stock counsel a fee of $505,003.40.[21]

In addition to facing the risks afflicting stock counsel, option counsel had to contend with the difficulties of maintaining an option class throughout trial and establishing damages. These risks were great in light of our denials of class certification on the merits and the apparently unprecedented nature of the theory that option purchasers could constitute a class under Rule 23, Fed. R.Civ.P. Option counsel suggests a bonus of 78%.

While we agree that the bonus should be higher than that awarded to stock counsel, we think a 78% bonus is too high. Option counsel cites no precedent for any such bonus. As noted earlier, recent decisions have tended to limit bonuses to 30%. While recognizing the difficulties at hand, we note that counsel have not wholly succeeded in overcoming them. Option class members must accept a reduction of 85% in their claimed losses before they participate in the fund, whereas stock class members suffer no such reduction. Option counsel candidly admits to some dissatisfaction with this aspect of the settlement.[22] Taking all this into account, we find that a bonus of 30% is appropriate. Applying this bonus only to time spent on the merits, we award option counsel a fee of $30,372.47.[23]

Stock counsel seeks to recover from the fund litigation expenses of $126,342.01. Adding to this the paralegal expenses improperly included in the attorneys' fee request, we award expenses to stock counsel of $186,107.51.

We grant option counsel's request for expenses of $224.24.

Stock counsel also seeks, pursuant to the stipulation of settlement, reimbursement from the Syntex defendants of $33,526.33 for expenses of notification and administration of the settlement. We grant this request and give stock counsel leave to seek additional reimbursement from such defendants for such expenses up to a total not in excess of $50,000, as stipulated.

### Conclusion

The foregoing represents our findings and conclusions on the reasonableness of the settlement and attorneys' fees.

The parties are directed to settle an order within ten (10) days embodying the terms of this opinion.

So ordered.

### APPENDIX

| | Hours | Rate | Total |
|---|---|---|---|
| 1. Stock Counsel Fees and Expenses | | | |
| A. Fees Subject to "Risk Factor Bonus" | 6,273.55 (-) | * | $404,169.50 |

**19.** *See Weiss v. Drew Nat'l Corp., supra,* 465 F.Supp. at 553 (15%); *Munsey Trust v. Sycor, Inc.,* 457 F.Supp. 924, 928 (S.D.N.Y.1978) (30%); *Kane v. Martin Paint Stores, Inc., supra,* 439 F.Supp. at 1058 (no bonus).

**20.** *Id.*

**21.** See Appendix.

**22.** Peckel Settlement Affidavit 3.

**23.** See Appendix.

| | | | | |
|---|---|---|---|---|
| B. | Fees Not Subject to "Risk Factor Bonus" | ** | ** | $ 20,000.00 ** |
| C. | Total Fees | | | |
| | Fees Subject to "Risk Factor Bonus" | | | $404,169.50 |
| | +20% "Risk Factor Bonus" | | | 80,833.90 |
| | Fees Not Subject to "Risk Factor Bonus" | | | 20,000.00 ** |
| | TOTAL FEE AWARD | | | $505,003.40 |
| D. | Expenses and Disbursements | | | $186,107.51 |
| 2. | Option Counsel Fees and Expenses | | | |
| A. | Fees Subject to "Risk Factor Bonus" | 197 | * | $ 21,883.63 |
| B. | Fees Not Subject to "Risk Factor Bonus" | 14.25 | $135 | $ 1,923.75 |
| C. | Total Fees | | | |
| | Fees Subject to "Risk Factor Bonus" | | | $ 21,883.63 |
| | +30% "Risk Factor Bonus" | | | 6,565.09 |
| | Fees Not Subject to "Risk Factor Bonus" | | | 1,923.75 |
| | TOTAL FEE AWARD | | | $ 30,372.47 |
| D. | Expenses and Disbursements | | | 224.24 |

(~) This figure represents all hours including time spent on the settlement approval and fee application. Given our finding that some duplicative work occurred, the figure is an overstatement.

* The hourly rates vary with the experience and expertise of the particular lawyer. *See* Bershad Affidavit 5; Peckel Fee Application 3.

** Estimates by court in the absence of more particular information.