The CAMPAIGN FOR A PROGRESSIVE BRONX and Janet Villafane, individually and on behalf of others similarly situated, Plaintiffs,

v.

Robert S. BLACK, Matteo Lumetta, Martin Richards, James F. Bass, Rosemary A. Millus, Norman George, Ferdinand C. Marchi and Orlando Velez, Commissioners of Elections, as members of and constituting the Board of Elections of the City of New York, and Kay Amer, as chief clerk of the Bronx Borough Office of said Board of Elections, Defendants.

No. 85 Civ. 6443 (WK).

United States District Court,
S.D. New York.

March 11, 1986.

Frederick J. Jacobs, New York City, Samuel Issacharoff, Lawyers' Committee for Civil Rights, Under Law, Voting Rights Project, Washington, D.C., for plaintiffs.

Frederick A.O. Schwarz, Jr., Michael C. Harwood, Corp. Counsel, City of New York, New York City, of counsel, for defendants.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Plaintiffs have moved for an award of attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1973*l* (e). Defendants oppose the motion.

## FACTS

The complaint in this action was filed on August 27, 1985 seeking immediate injunctive relief under the Voting Rights Act of 1965 and its amendments, 42 U.S.C. § 1973 *et seq.* Plaintiffs alleged, *inter alia,* that a confluence of factors, including acts and omissions by the defendants, threatened to deny the franchise to thousands of duly registered Hispanic voters in Bronx County in the Democratic primary election which was to be held on September 10, 1985.

Plaintiff Campaign for a Progressive Bronx ("Campaign") is the duly authorized political committee of New York State Assemblyman Jose Serrano, who was an unsuccessful candidate for Bronx Borough President in the 1985 Democratic Primary.[1] Serrano is of Hispanic origin. Plaintiff Janet Villafane is an American citizen of Puerto Rican descent who is a registered voter in Bronx County. Plaintiffs brought this lawsuit individually and as a class action pursuant to F.R.Civ.P., Rules 23(a) and (b)(2). (Complaint at Paras. 6, 7 & 8)

Defendants (collectively, "Board") are all members of the New York City Board of Elections, except for defendant Kay Amer who is chief clerk of the Board's Bronx Borough Office. (Complaint at Para. 9)

Defendants are responsible, pursuant to Articles 3, 4, 5, 6, 7, 8, and 9 of the New York State Election Law for registering voters and maintaining accurate records of duly registered voters, notifying voters of changes in their registration status, hiring and training election inspectors and poll clerks, and conducting primary and general elections for the City of New York. (Complaint at Para. 9)

Bronx County is a covered jurisdiction under Section V of the Voting Rights Act of 1965. This imposes upon the defendant Board an affirmative continuing duty to ensure that qualified minority voters are afforded equal access to the ballot. In recent elections Democratic voter turnout in the Bronx has fallen, despite a simultaneous increase in the number of registered Democratic voters and in particular an increase in the number of registered Democratic voters who are Hispanic. (Complaint at Paras. 3, 4, 12, 13 & 14)

In the November, 1984 general election there had been allegedly "massive confusion" in polling places in the Bronx, purportedly caused by the lack of adequate Spanish language assistance for voters in predominantly Hispanic election districts. Specifically plaintiffs allege that election inspectors and polling clerks had not received adequate training under section 3–412 of the New York State Election Law, had not been familiar with the procedures for voting by affidavit ballot when no registration card could be found for would-be voters, and that too few of them had been bi-lingual. (Complaint at Para. 22)

Plaintiffs allege, *inter alia* that the effect of these irregularities had been to prevent or discourage many Hispanic voters from exercising the franchise, which explains how, despite an increase in the number of registered voters in Bronx County in 1984, the number of voters actually casting ballots decreased. Between the 1984 elections and the filing of this lawsuit, defendant Board had allegedly taken no steps to increase the availability of suitably trained Spanish speaking inspectors or to provide updated training to all inspectors. (Complaint at Para. 23)

---

**1.** Serrano was narrowly defeated in the primary by incumbent Stanley Simon. Simon's margin of victory was 3,123 votes out of approximately 113,000 cast. (*The New York Times,* September 27, 1985, p. B3)

Section 3–404 of the New York State Election Law provides that "the board of elections of each county shall on or before the fifteenth day of July of each year select and appoint election inspectors and poll clerks for each election district therein and may thereafter designate election inspectors and poll clerks to fill any vacancy for an unexpired term."

A report commissioned by the Mayor of New York City reached the conclusion on July 30, 1985 that "the system of registration and elections in New York City is highly inefficient, operates poorly, and does not meet the modern day needs of the voters." The report went on to describe the registration process as "largely a manual one that is inefficient in terms of process, form, and execution," and chronicle the long-term decline in the quality of election inspectors. There is no evidence of any measures having been taken to remedy these problems between the publication of that report and the filing of this lawsuit. (Complaint at Para. 24)

In Puerto Rico voters need voter identification cards to vote. In New York City the Board normally sends registered voters identification cards, but these cards are not needed to vote. (Complaint at Paras. 16 and 17). Some Hispanic voters in Bronx County, including plaintiff Villafane, did not receive voter identification cards prior to the September 10 primary, creating the misimpression that they were therefore not entitled to vote in that primary. (Complaint at Para. 18)

Plaintiff Campaign for a Progressive Bronx and other groups undertook to register new Hispanic voters in the Bronx during the Summer of 1985. A random check on August 23, 1985 of approximately 75 names of such newly registered voters revealed no record of the registration of six of these voters. (Complaint at Para. 21)

On August 23, 1985, four days before filing the complaint in this action, Serrano sent a letter to defendant Amer, the Board's chief clerk, requesting that the Board conduct a voter education campaign in the Spanish and English media informing voters of their right to vote without an identification card and upon affidavit ballot or court orders, and to take certain other steps to protect the rights of minority voters. Amer responded to Serrano's letter on August 26, 1985, the day this lawsuit was filed. In her letter she stated that she could not order the airing of any advertisements or public service announcements because only the main office of the Board in Manhattan had the authority to undertake such activities. She then offered "to assist and be available to help in any way that I can." Amer also informed Serano that she was unaware of any irregularities during the November, 1984 election or of any problems regarding voter identification cards or election inspectors, and that training sessions for election inspectors would occur on August 27 and 28th at 3 p.m. and 7 p.m. at Roosevelt High School in the Bronx.

Also on August 26, 1985, the Board issued a press release informing the public of the existence of the Board's telephone bank set up exclusively to inform voters of their polling places. This press release also stated: "Important!! You do not need your voter identification card to vote."

In the complaint filed on August 26, 1985, plaintiffs sought declaratory and injunctive relief. They sought a declaration that defendants' administration of the registration and election system was unlawfully diluting Hispanic voting strength and was denying plaintiff class rights secured under Section 2 of the Voting Rights Act of 1965. (Complaint at Para. 29(a))

Plaintiffs also sought an injunction directing the defendants to do the following:

1) Undertake a publicity campaign through Spanish language radio, television and newspapers advising Bronx voters that they do not need voter identification cards to vote and that if no record of their registration can be found at the polling place on election day, they can still vote by affidavit ballot (Complaint at Para. 29(c)), and to prepare leaflets and large signs, in English and Spanish, for use on September 10, 1985, advis-

ing voters of the above. (Complaint at Para. 29(e))

2) Establish one or more bilingual telephone hotlines which voters can call to find out the location of their polling place. (Complaint at Para. 29(d))

3) Assign sufficient numbers of, and in no case less than one, adequately trained Spanish speaking election inspectors to each election district where Hispanic voters are expected to vote on September 10. (Complaint at Para. 29(f))

4) Conduct a mandatory training session for all election inspectors and poll clerks, with particular emphasis on the procedures and requirements for using affidavits and emergency ballots, prior to the September 10 election. (Complaint at Para. 29(g))

At the same time plaintiffs filed the complaint in this action, they also sought an Order to Show Cause and a preliminary injunction. Pursuant to this Order to Show Cause the parties made their first court appearance in this matter before Judge Leisure in Part I on August 27.

There is no transcript of that appearance. Judge Leisure signed an Order to Show Cause requiring the parties to return two days later on August 29, 1985. He also recommended that counsel for the parties meet to discuss the issues prior to returning to court.

Counsel for the parties met on August 28, 1985 pursuant to Judge Leisure's instruction. Also present were Amer and Daniel DeFrancesco, Deputy Director of the Board. At this meeting the parties discussed the possibility of the Board's spending an extra $20,000 on advertising. They also discussed the plaintiffs' providing assistance to the Board in locating the election districts where bilingual assistance would be most necessary and providing assistance in locating additional inspectors. Plaintiffs provided defendants with a computerized printout of the names of voters whose registrations had been filed with the Board by plaintiff Campaign. Defendants agreed to verify the registration status of these persons.

On August 29, 1985 the parties appeared again before Judge Leisure. Plaintiffs provided the Court with a status report indicating the steps that had been taken thus far. Judge Leisure recommended that the parties meet again and continue trying to work out the problems between themselves. As long as progress was being made through negotiations, Judge Leisure indicated that a court order did not seem necessary.

On August 30, 1985 the parties again appeared before Judge Leisure. Counsel for Plaintiffs provided the Court with a second status report, informed the Court of his concern with respect to the provision of bilingual assistance at polling places, and renewed his request for a preliminary injunction. Counsel for defendants responded by saying that the Board would comply with the law by providing one Spanish speaking inspector in every election district which contained over 5 percent Spanish speaking population. After considerable discussion, the parties agreed to meet together and work out a stipulation, in lieu of any type of court order, which could be signed by Judge Leisure at 9 a.m. on September 3, 1985.

On August 30, 1985 Amer wrote a letter to counsel for the defendant asserting that an examination of the ledgers of the Board revealed that the six individuals who plaintiffs allegedly had registered but whose names could not be located in the ledgers, were, in fact, in the ledgers. Amer provided further information regarding the registration status of Hispanic registrants that plaintiffs could not locate in the ledgers and also provided the names of inspectors who would be working in the upcoming elections.

On September 3, 1985, the parties signed a stipulation in the presence of Judge Leisure. The stipulation provided for the following:

1) Defendants would continue the voter education campaign in the Spanish language press, radio and television on a daily basis. Defendants agreed to spend

the sum of approximately $20,000 on such campaign which would include information advising voters that they would not need a voter identification card in order to vote in the September 10 primary.

2) Defendants would continue to prepare a comprehensive list of voting places and election districts for which bilingual assistance would be deemed necessary pursuant to the bilingual assistance provisions of the Voting Rights Act of 1965 and would endeavor to present a copy of such list to the Court and to plaintiffs' counsel by September 4, 1985.

3) Defendants stated that they had contacted various colleges seeking standby election inspectors and both parties agreed to seek additional assistance prior to election day.

On September 6 plaintiffs, claiming that defendants had failed to comply with the terms of the stipulation, sought an order to show cause in this Court. In our absence and in the absence of Judge Leisure, the parties appeared in Part I, but were unable to have a hearing.

On September 9, the day before the election, the parties appeared before us. Plaintiffs claimed that defendants had failed to comply with the terms of the stipulation. Defendants asserted that they were doing all they could. We instructed the parties to continue their joint efforts at resolving problems as they arose and retained ongoing jurisdiction of the matter.

After the primary election the parties continued to communicate with each other over the degree of compliance with the stipulation and in attempts to settle the question of attorneys' fees. We issued an order closing the case on December 3, 1985, but leaving open the question of attorneys' fees. The parties were not able to settle that question. This application followed.

Plaintiffs' application for fees sets forth the hours worked by two attorneys and a paralegal on this entire lawsuit and also seeks an upward adjustment of this fee. Plaintiffs claim the following:

| Attorney | Hours | Hourly Fee | Lodestar Fee |
|---|---|---|---|
| Frederick J. Jacobs | 110.5 | $115.00 | $12,707.50 |
| Samuel Issacharoff | 82.6 | 110.00 | 9,086.00 |
| Paralegal | | | |
| Barry J. Fisher | 15.5 | 30.0 | 465.00 |

Total fee claimed by plaintiffs:
$23,126.96 × 1.5 (upward adjustment) = $34,690.44

Plaintiffs also seek out-of pocket litigation expenses in the amount of $868.46.

The total plaintiffs seek is $35,558.90 plus pre-judgment interest pursuant to 28 U.S.C. § 1961.

Jacobs is a 1982 graduate of the Yale Law School and is currently employed as counsel to the American Federation of State, County and Municipal Employees, District 37. He was previously employed by the Legal Aid Society.

Issacharoff is a 1983 graduate of the Yale Law School. He is presently Acting Director of the Voting Rights Project of the Lawyers' Committee for Civil Rights Under Law, for which he has worked since he was a law student in 1981. He is currently involved in twelve voting rights cases around the country, has published academic works in this area, and teaches at the University of Pennsylvania Law School.

Fisher is a paralegal with the Voting Rights Project of the Lawyers' Committee for Civil Rights Under Law.

Michael Harwood, counsel for defendants, is a 1982 graduate of the Albany Law School who has worked for the New York City Law Department (Corporation Counsel) since his graduation.

## DISCUSSION

1. Prevailing Party

█ This application for attorneys' fees and litigation expenses is brought under the Voting Rights Act of 1965, 42 U.S.C. § 1973*l* (e), which provides,

In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendments, the court, in its discretion, may allow the prevailing par-

ty, other than the United States, a reasonable attorneys' fee as part of the costs.

In applying this statute we follow the Supreme Court's recommendation that we be guided by the case law developed under the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988. *See Hensley v. Eckerhart*, (1983) 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40; *see also Hanrahan v. Hampton*, (1980) 446 U.S. 754, 758 n. 4, 100 S.Ct. 1987, 1989 n. 4, 64 L.Ed.2d 670. In enacting both of these statutes, Congress directed that prevailing parties "should ordinarily recover an attorneys' fee unless special circumstances would render such an award unjust." S.Rep. No. 94–295, 94th Cong., 1st sess. 40 (1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 774, 807 (Section 1973*l* (e); S.Rep. No. 94–1011, 94th Cong., 2d Sess. 4 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5912.

Plaintiffs are "prevailing parties" within the meaning of these statutes "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart, supra,* 461 U.S. at 433, 103 S.Ct. at 1939.[2] "[T]he prevailing party must show a causal connection between the relief obtained and the litigation in which fees are sought. A causal connection exists if the plaintiff's lawsuit was 'a catalytic, necessary, or substantial factor in attaining the relief.'" *Gerena-Valentin v. Koch,* (2d Cir.1984) 739 F.2d 755, 758–759 quoting *Commissioners Court of Medina County, Texas v. United States,* (D.C.Cir. 1982) 683 F.2d 435, 440 (other citations omitted). A plaintiff can become a "prevailing party" if it "vindicate(s) rights through a consent judgement or without

formally obtaining relief." S.Rep. No. 94–1011, *supra,* at 4, 1976 U.S.Code Cong. & Ad.News at 5912; S.Rep. No. 94–295, *supra* at 41, 1975 U.S.Code Cong. & Ad.News at 808.

The inquiry as to whether a party has prevailed is "an intensely factual and pragmatic one" because "clues to the provocative effects of plaintiffs' legal efforts are often best gleaned from the chronology of events: defendants, on the whole are usually rather reluctant to concede that the litigation prompted them to mend their ways." *Posada v. Lamb County, Texas,* (5th Cir.1983) 716 F.2d 1066, 1072; *See Gerena-Valentin v. Koch, supra.,* 739 F.2d at 758 ("The inquiry into causality is largely factual.")

In this case we do find that plaintiffs are a "prevailing party." The voter education campaign in the Spanish media and the efforts to locate and assign additional bilingual election inspectors were significant victories for the plaintiffs and were undertaken by defendant Board in response to and because of the initiation and maintenance of this action.

Defendants maintain that they acted in good faith throughout the proceedings and did their best to comply with plaintiffs' demands. The record reflects this and we so find. However, defendants' good faith is not an issue. Citizens whose rights are protected by the Constitution are entitled to expect that public officials will employ good faith in carrying out their official functions to protect those rights. We applaud the Board's cooperative and conciliatory attitude, but note that the good faith acts occured *after,* and apparently *in response to* the complaint which was filed in this action.

---

**2.** Different Courts have articulated the "prevailing party" standard in slightly different ways. *See Commissioners Court of Medina County, Texas v. United States,* (D.C.Cir.1982) 683 F.2d 435, 440 ("the party must have substantially received the relief sought, and second, the lawsuit must have been a catalytic, necessary, or substantial factor in attaining the relief."); *Williams v. Leatherbury,* (5th Cir.1982) 672 F.2d 549, 550 ("a causal connection between the fil-

ing of the suit and defendant's action and that the defendant's conduct was required by law."); *American Constitutional Party v. Munro,* (9th Cir.1981) 650 F.2d 184, 188 ("clear, *causal relationship* between the litigation brought and the practical outcome realized.") (emphasis in original); *Robinson v. Kimbrough* (5th Cir.1980) 620 F.2d 468, 478 ("a significant catalytic factor in achieving the primary relief sought through the litigation").

The Board concedes that it was unaware of the problems with the voter identification cards and the advisability of a voter education campaign. Amer's August 26 response to Serrano's letter stated that she was unable to authorize such a voter education campaign. Given the short period of time between the August 26 response from Amer and the September 10 primary, we find that it was reasonable for plaintiffs to have filed this lawsuit on August 26, to have proceeded by Order to Show Cause and to have sought immediate injunctive relief. The Board's swift compliance with the proposed voter education campaign appears to have been a response to such conduct by plaintiff.

Section 3–404 of the New York Election Law obligated the Board to assemble a list of election inspectors and the Districts to which they would be assigned by July 15. Further, the report commissioned by Mayor Koch and issued on July 30, 1985, which was highly critical of the system of provision of election inspectors, put the Board on notice that its obligations were not being fulfilled. Nonetheless, there contains not a scintilla of evidence on the record to indicate that prior to the filing of this lawsuit the Board had undertaken any steps to address the problem of election inspectors. It is clear, however, that subsequent to the filing of the suit and the meetings directed by Judge Leisure, the Board did undertake, with the aid of plaintiffs, to assemble a list of bilingual inspectors and election districts where they would be needed, something that they had been under a legal obligation to do as of July 15 and had not done.

Defendants respond by arguing that many necessary steps are taken in the final weeks before an election and most of the relief plaintiffs sought would have been forthcoming without the bringing of this action. This argument speaks more to the degree to which plaintiffs prevailed and therefore to the amount of fees to which they are entitled. The record is silent as to any plans the defendants had regarding election inspectors or educating Hispanic voters of the fact that they did not need identification cards to vote. Having found that plaintiffs "prevailed" on these issues, the statutory scheme creates a presumption that they will be entitled to attorneys' fees, and the question becomes what portion of the requested fees are "reasonable." *Hensley v. Eckerhart supra* 461 U.S. at 433, 103 S.Ct. at 1939.[3]

Defendants also argue that considering plaintiffs to be a "prevailing party" in a case where the Board has actively sought an agreeable settlement and cooperated in good faith throughout the proceedings will, as a matter of policy, create a bad precedent. In the future, they argue, the Board will be less inclined to settle and to cooperate with plaintiffs' demands, to which they may not be legally obligated to accede, than they were in the case at bar. They should not, the argument continues, now be penalized for having cooperated. This argument makes little sense. First, any unwillingness to settle in future actions which turn out to be meritorious will only increase the hours spent on the case by opposing counsel and thereby increase the amount of fees awarded. Secondly, counsel for the defendants continues to perceive an award of fees in a Voting Rights Act case as somehow punitive when, in fact, it is an inducement to which any prevailing party is presumed to be entitled. Finally, the vague threat that future cases will be met with less cooperation by the Board if plaintiffs receive an award here is without

---

**3.** Unlike most cases where the "American" rule dictates that parties ordinarily bear their own costs, *Alyeska Pipeline Service Co. v. Wilderness Society* (1975) 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141, the statute which provides for awards of attorneys' fees in Voting Rights Act cases creates the opposite presumption. The legislative history makes clear that Congress wanted to encourage private citizens' bringing lawsuits to safeguard the important constitutional rights protected by the Voting Rights Act and therefore offered the prospect of attorneys' fees to induce the bringing of meritorious actions. At the same time, the Act guards against inviting meritless lawsuits in hopes of gaining attorneys' fees by providing for the awarding of attorneys' fees to defendants if an action brought is deemed frivolous. *See Gerena-Valentine v. Koch, supra,* 739 F.2d at 760 n. 2.

basis. Defendants' claim seems to be that when the complaint was filed, the Board was already in the process of doing everything it ultimately accomplished and that the litigation was unnecessary. If they had established that position in opposing the instant application, plaintiffs' request for fees would obviously have been denied. Defendant in no sense subjected itself to liability for fees by seeking to comply with plaintiffs' demands rather than litigating.

2. A Reasonable Fee

Having determined that plaintiffs are a prevailing party in this lawsuit, we must now consider what is a reasonable fee. That task requires the making of several different determinations. *See Hensley v. Eckerhart, supra* 461 U.S. at 434, 103 S.Ct. at 1939. *See also Johnson v. Georgia Highway Express, Inc.,* (5th Cir.1974) 488 F.2d 714, 717–719. They are:

1) What were the number of hours reasonably expended at a reasonable hourly rate.

2) What were the results obtained, i.e., did plaintiffs succeed on all or only some of their claims for relief?

3) Did the plaintiffs achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

The Supreme Court stated in *Hensley* that where a plaintiff has not prevailed on all of its claims, "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." 461 U.S. at 437, 103 S.Ct. at 1941.

Plaintiffs originally sought a voter education campaign, a bilingual hotline, the assignment of an adequate number of bilingual election inspectors to appropriate districts in the Bronx, the conducting of a mandatory training session for all election inspectors and a declaratory judgement that defendants' administration of the registration and electoral system was unlawfully diluting Hispanic voting strengths.

While our calculation regarding plaintiffs' degree of success need not be mathematical, we find it helpful to determine the number of claims upon which plaintiffs succeeded and then to adjust them slightly to account for the relative importance of the claims and their interrelatedness. It is within our disretion to adjust the requested fee by applying percentage cuts to the requested hours. *New York Association of Retarded Children v. Carey,* (2d Cir.1983) 711 F.2d 1136 at 1146.

Out of the five claims set forth in the complaint, the plaintiffs prevailed on two, the voter education campaign and the identification and assignment of election inspectors. The allegation of the Board's failing to file the registration forms of Hispanic voters, to which the declaratory relief was directed, was demonstrated to be incorrect and was abandoned during the lawsuit. The telephone hotline was instituted on the same day the complaint was filed and we can discern no causal relationship between these two events. The training sessions for election inspectors occured according to a plan that was in effect prior to the initiation of this action, and although plaintiffs still maintain that these sessions were inadequate in several respects, no relief was obtained in the course of this litigation which would tend to establish that plaintiffs in any way prevailed on that issue.

Accordingly, plaintiffs prevailed on two of the five claims raised in their complaint. These claims were central to the lawsuit and interrelated to the claims that failed. Plaintiffs complaint identified, *inter alia,* four general problems: voter identification cards, election inspectors, procedures for affidavit ballots and mishandling of registration forms of Hispanic voters. The relief obtained addressed two of these four problems. Therefore, it seems fair to allocate one half of plaintiffs' proposed hourly fees to their successful claims.

The hourly fees proposed by plaintiffs' counsel require minor adjustments to make them reasonable for attorneys of their skill and experience. Counsel for the defendants (Harwood) is an attorney of similar

skill and experience who recently claimed a higher hourly fee ($125) in an application for attorneys fees pursuant to section 1988, which entitles a defendant's attorney to counsel fees in a Voting Rights Act case if the action brought was frivolous. *Perez v. Valez* (S.D.N.Y.1985), 629 F.Supp. 734. In *Perez*, Judge Carter lowered Harwood's hourly fee to $100. We agree with defendants that this is a fair hourly fee for both Jacobs and Issacharoff. *See New York Association for Retarded Children v. Carey supra* 711 F.2d 1136, 1148–1153. These hourly rates represent those "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stevenson,* (1984) 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891. Jacobs graduated from law school the same year as Harwood and is currently entitled to the same fee that Harwood received in *Perez*. While Issacharoff was a year behind both Jacobs and Harwood in law school, his extensive involvement in voting rights litigation, dating back to his law school days, entitles him to the same $100 hourly fee as the others.

■ Compensation of plaintiffs' para-legal on an hourly basis is not permissible. In *City of Detroit v. Grinnell Corporation,* (2d Cir.1974) 495 F.2d 448, 473 the Court of Appeals stated:

> The court will need to know the experience and training of petitioner's paraprofessional assistants and the rate at which he pays them since he must be reimbursed for their wages even though their time cannot be considered as input in the fee award determination.

*See also Baron v. Commercial & Industrial Bank of Memphis* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) 97,132 at 96,-244 n. 17 (S.D.N.Y.1979). While both of these cases arose in the context of discerning what portion of an award in a class action would go to the attorneys for the class, we find that the teaching of *Grinnell* is that paralegal time is to be reimbursed as an expense. *See Desimone v. Industrial Bio-Test Laboratories, Inc.* (S.D.N.Y. 1979) 83 F.R.D. 615. Since plaintiffs have provided us with no information about the wages paid to their paralegal, we are unable to compensate them for his services.

■ Plaintiffs seek an upward adjustment of fifty percent of the lodestar fee. In *Blum v. Stevenson,* (1984) 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891, 902, the Supreme Court stated that an upward adjustment of an attorneys' fee award may be made in cases of "exceptional" success. We find that this is not such a case. Plaintiffs "introduced no evidence that enhancement was necessary to provide fair and reasonable compensation." *Blum supra.,* at 901, 104 S.Ct. at 1550, 79 L.Ed.2d at 904. Accordingly, plaintiffs are not entitled to an upward adjustment of the lodestar fee.

Plaintiffs request reimbursement for out-of-pocket litigation-related expenses. All of these expenses, except for the restaurant tab of $56.48 from the One Hudson Cafe, are reasonable and shall be allowed.

■ Plaintiffs are not entitled to pre-judgment interest pursuant to 28 U.S.C. § 1961. That section applies to judgments. The statute which provides for attorneys' fees under the Voting Rights Act, 42 U.S.C. § 1973*l* (e), states that the attorneys' fee shall be "part of the costs." Pre-judgment interest pursuant to 28 U.S.C. § 1961 does not apply to costs.

## CONCLUSION

Plaintiffs are entitled to recover $9,655.00 in attorneys' fees and $811.98 in out-of-pocket expenses. Their total recovery shall be $10,466.98.

Plaintiffs shall submit the appropriate judgment.

SO ORDERED.